NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

OKLA–INN, d/b/a Holiday Inn of
Henryetta, Respondent,

Retail Clerks Union, Local No. 73, Retail
Clerks International Association,
AFL–CIO, Intervenor.

No. 72–1737.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted May 22, 1973.

Decided Oct. 26, 1973.

Rehearing Denied Jan. 23, 1974.

Elliott Moore, Acting Asst. Gen. Counsel, Russell H. Gardner, William F. Wachter, Marjorie S. Godfreed, Peter G. Nash, John S. Irving, and Patrick Hardin, Washington, D. C., for petitioner.

C. A. Kothe and Richard L. Barnes, Koths & Eagleton, Inc., Tulsa, Okl., for respondent.

John M. Keefer, Jarboe & Keefer, Tulsa, Okl., for intervenor.

Before SETH and DOYLE, Circuit Judges, and LARAMORE,* Senior Judge.

* Senior Judge Don N. Laramore of the United States Court of Claims is sitting by designation.

LARAMORE, Senior Judge.

This case is before the court pursuant to section 10(e) of the National Labor Relations Act, 61 Stat. 136 (1947), 73 Stat. 519 (1959), 29 U.S.C. § 151 et seq., upon application of the National Labor Relations Board for enforcement of its order issued against Okla-Inn, d/b/a Holiday Inn of Henryetta (herein "the Company") on July 26, 1972. The Company operates a transient motel and restaurant at Henryetta, Oklahoma under a franchise from Holiday Inns of America, Inc.

The Board found that the Company and Lindo Corporation constituted a single integrated enterprise for jurisdictional purposes and that their combined gross volume of business satisfied the Board's discretionary jurisdictional standards. The Board further found that the Company violated section 8(a)(1) of the Act by coercively interrogating employees, soliciting them to withdraw from the Union, asking them to dissuade their fellow employees from supporting the Union, creating the impression of surveillance and threatening discharge, layoff, and business closure. Additionally, the Board found that the Company violated section 8(a)(3) and (1) of the Act by failing and refusing to reinstate the striking maids, by discriminatorily discharging five other employees and by changing the conditions of employment of DeLois Porter and discharging her because of her Union adherence. Finally, the Board found that the Company violated section 8(a)(5) and (1) of the Act by refusing to recognize and bargain with the Union and that a bargaining order was warranted.

The Board's order directs the Company to cease and desist from the unfair labor practices found, and from in any other manner interfering with, restraining or coercing employees in the exercise of their section 7 rights. Affirmatively, the Board's order requires the Company to offer all of the discriminatees, except for one striking maid who did not make an unconditional offer to return to work, immediate and full reinstatement to their former or substantially equivalent positions, without prejudice to their seniority or other rights and privileges, to make them whole for any loss of earnings sustained by reason of the discrimination against them, to bargain with the Union upon request, and to post appropriate notices.

The threshold question presented by the Company in this case is whether the Board has jurisdiction over the respondent Company. The Board combined the operations of the Okla-Inn and the Lindo Corporation, a Holiday Inn in McAlester, Oklahoma, as constituting a "single integrated enterprise" which would permit the combining of their annual gross revenues for the purpose of meeting the Board's jurisdictional test.

■ The short answer to this contention is that the limitation on the exercise of the Board's jurisdiction is self-imposed, and it can exercise jurisdiction under the statute and related cases under any reasonable circumstances. 29 U.S.C.A., see § 160, Note 36; NLRB v. W. B. Jones Lumber Co., 245 F.2d 388 (9th Cir. 1957); NLRB v. Marinor Inns, Inc., 445 F.2d 538 (5th Cir. 1971); NLRB v. WGOK, Inc., 384 F.2d 500 (5th Cir. 1967).

■ The Board found that respondent Okla-Inn had violated section 8(a)(1) of the Act by coercively interrogating employees, soliciting their withdrawal from the Union, asking them to dissuade other employees from supporting the Union and threatening discharge, layoff, and closing of the motel. There is abundant substantial evidence in the record respecting these accusations to support the Board's findings.

For example, a few days after the Union authorization petition was circulated, Innkeeper Braasch told kitchen employees Bobby Blair and Danny Brisson that he knew they had signed the petition and wished they would have their names removed. Braasch asked another kitchen worker, Tommy Bryan, whether the other "boys" had been giving him

"any trouble about the Union" and asked a cook, Dorothy Bond, how she felt about the pickets, adding, "If I was you, I wouldn't even be talking to them."

In a similar vein, restaurant supervisor Louchery told waitress Juanita Green that she knew which employees had signed cards, and that if they wanted to keep their jobs they had better watch what they were doing. She also said she had been told that Green had signed a card. Additionally, Louchery requested another waitress, Cora Bryan, to help dissuade other employees from signing authorizations. She also asked whether Bryan had signed the petition and when Bryan said "no," she stated that she knew Bryan had not signed the petition, but that she also knew Bryan had signed a card and that was "just as bad." On September 8, housekeeper Bartholic told a new maid, Myrtle Mouser, that she would be fired if she signed a Union card.

As we hold *infra*, the Company also discriminatorily discharged five card signers on September 12 and 14. In October, Braasch asked desk clerk DeLois Porter why she "was walking out there with her friends, the sorry sons of bitches" meaning the pickets, and said that they were wasting their time. In November, Braasch told Porter that the Inn would close "before the Union would come in." In December, Louchery told Porter that the Union "just couldn't get in" because if it did Braasch would lose his job. Porter said she didn't think Braasch would lose his job and Louchery retorted that if Porter voted for the Union and the Company found out, Porter would lose her job. Later that month, Louchery's husband asked waitress Janet Ashley whether she was going to vote for the Union and Louchery spoke up before Ashley could answer, saying, "you know she is not going to vote for the Union." On another occasion, Louchery asked Ashley whether she would like to work the morning shift. She said that if Ashley did not vote for the Union, Cora Bryan would be fired and Ashley could have her shift. In

January, Louchery told Ashley that if the Union came in, the Company "would go to short orders and close the buffet." She also said that Cora Bryan, Esther Johnson and DeLois Porter would be fired if the Union lost the election identifying them as Union supporters.

Also in January, Louchery asked waitress Beverly Poulton whether she had decided which way she would vote and stated that the Company would find out if she voted for the Union, that they had "ways of finding out" and Poulton would lose her job. Louchery also called Poulton at her home on several occasions, engaging in substantially the same conversation. She also called Poulton when a Union representative was present at Poulton's house and asked whether the Union man was there. Finally, a few days before the election, Louchery asked waitress Linda Whitlock how she was going to vote and warned that if Whitlock did vote Union, she would not have a job because the Company would have to recall the other girls who were laid off.

These facts amply support the Board's findings of section 8(a)(1) violation and require no further discussion. NLRB v. Miller Trucking Service, Inc., 445 F.2d 927, 930–931 (10th Cir. 1971); NLRB v. Wylie Manufacturing Company, 417 F.2d 192, 194–195 (10th Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 915, 25 L. Ed.2d 94; NLRB v. Hawthorne Aviation, 406 F.2d 428, 429 (10th Cir. 1969); Betts Baking Co., Inc. v. NLRB, 380 F. 2d 199, 201 (10th Cir. 1967); Hendrix Manufacturing Company, Inc. v. NLRB, 321 F.2d 100, 104 (5th Cir. 1963).

Next the Board found that the Company violated section 8(a)(3) and (1) of the Act by failing and refusing to reinstate the striking maids. The respondent claims that the maids quit because their supervisor was fired and relies on the cases of Dobbs Houses, Inc. v. NLRB, 325 F.2d 531 (5th Cir. 1963); American Art Clay Company v. NLRB, 328 F.2d 88 (7th Cir. 1964); and NLRB v. Coal Creek Coal Co., 204 F.2d 579 (10th Cir. 1953) for the principle that

concerted activity over supervisory personnel *per se* is not protected by the National Labor Relations Act. The argument continues that the employees' concerted activity is not protected by law, that there is not substantial evidence for the Board's findings, and that the Board's request for reinstatement of the strikers is wrong.

 The issue as to whether the maids have a right to be reinstated turns on whether the walkout was a protected activity. We hold the maids were engaged in legal and protected activities, a *bona fide* protest over unfair work conditions, for their mutual aid and protection as guaranteed by section 7 of the Act, 29 U.S.C. § 157 (1970), as amended. Section 7 protects concerted activity by workers to alleviate oppressive working conditions, regardless of whether their activity is channeled through a union, through collective bargaining, or through some other means. United Packinghouse, Food and Allied Workers International Union, AFL–CIO v. NLRB, 135 U.S.App.D.C. 111, 416 F.2d 1126, cert. denied, Farmers' Co-op Compress v. United Packinghouse etc., 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969). To be protected by section 157, the concerted activity of employees who stage a walkout must be directed toward a dispute concerning conditions of employment. Hagopian & Sons, Inc. v. NLRB, 395 F.2d 947 (6th Cir. 1968). Employees may seek to change any term or condition of their employment and they have an ultimate sanction in the use of a strike. First National Bank of Omaha v. NLRB, 413 F.2d 921 (8th Cir. 1969).

 The standard on review is whether there is substantial evidence to support the Board's findings. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); American Federation of Television & Radio Artists v. NLRB, 129 U.S.App.D.C. 399, 395 F.2d 622 (1968); United Packinghouse, Food and Allied Workers International Union, *supra*. There is little difficulty finding that the Board had substantial evidence from which it could reasonably conclude that the maids were engaged in an activity protected by law and that they are entitled to relief under the National Labor Relations Act. The record clearly shows that the maids were subjected to unfair work requirements. Each time the minimum wage was increased, the hotel management increased the maids' work requirements until the point was reached where the work level required could not be completed in a reasonable and conscientious manner. The maids complained about the situation. Innkeeper Braasch "suggested" the maids omit some of their usual work in order to finish their assignments on time. He also said he would deny such a statement if the maids told anyone about it. The maids were indignant about this cavalier attitude and wanted to immediately walk out in protest. However, they were placated by their supervisor, Eunice Burke, who reasoned they should make an effort to accomplish the job and then if dissatisfied they could always walk out. The maids tried and were diligently supported in their work efforts by Burke. Burke discussed the maids complaints with Braasch, who suggested that he and Burke visit another Inn to see how the work was accomplished there. Braasch never made the visit. The record does not say why. Burke finally went to inquire on her own initiative. Subsequently, Braasch fired Eunice Burke with a comment that the work was not getting done. The maids then walked off the job and set up a picket line.

On a number of occasions the Board has contended that concerted employee activity regarding supervisory personnel is a protected activity. NLRB v. Guernsey-Muskingum Electric Co-operative, Inc., 285 F.2d 8 (6th Cir. 1960); NLRB v. Phoenix Mutual Life Insurance Co., 7 Cir., 167 F.2d 983, 988, cert. denied, 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395 (1948). In furtherance of its contention in this case the Board's petition cites the case of NLRB v. Plastilite Corporation, 375 F.2d 343 (8th Cir. 1967) for the principle that the employee's identi-

fy with and recognized capability of a supervisor involved in a management dismissal has a direct impact on the employees own job interests and that they may, therefore, walk out in protest. The court did not actually hold that as a matter of right employees could walk out in protest over a supervisory discharge.[1] The test is the underlying reasons for the walkout and whether they are reasonable relative to the circumstances involved. The supervisory protests in *Muskingum* and *Phoenix* did not involve walkouts, but centered on complaints and suggestions, respectively, regarding supervisors. This was held to be reasonable conduct under the circumstances that prevailed in those cases. The court cannot accept the argument in this case that where a supervisory dispute results in a walkout, the activity is unreasonable, unprotected, and illegal *per se*.

■ It is clear from the facts and the sequence of events that the maids walked out primarily due to poor work conditions. The supervisory dismissal was merely the last straw in a brooding atmosphere created by unfairly increasing the workload to the point where assignments could not conscientiously be accomplished. The facts show that the maids contemplated a walkout in protest over work conditions long before their supervisor was dismissed. Where a supervisor's dismissal initiates a walkout that is premised on underlying objectionable work conditions, it is a legal protected concerted activity under the Act.

The respondent then asks the court to accept the contention that the maids quit because one witness, a news reporter, testified that while interviewing the maids on the picket line one maid said they quit and no other picketer contradicted the statement. Taken independently, this is a persuasive bit of evidence. However, within the context of the entire record, and the history of abuses it enumerates, the impact of the reporter's statement is negated.

■ The declarations and acts of the employees at the time of the walkout and not the reasons subsequently given should be considered. Dobbs Houses, Inc. v. NLRB, *supra*. We consider this to mean the words and acts immediately preceding and simultaneously accompanying the walkout, including the declarations made to the employer and the facts and circumstances that surrounded it. The record does not show that the maids unequivocally announced to the employer that they quit. It certainly does not disclose an intention or motivation to do so. The workers had an inextricable interest in their supervisor insofar as their work conditions were concerned. When she was separated from them they reasonably felt they had no other recourse but to walk off the job, as originally planned, in protest over the work conditions. The words spoken to the reporter were subsequent to the actual walkout. They were addressed by the employee who was "fired" to a third party. No other employee verbalized that her intention was to just plain quit, and the facts do not reveal such a clear-cut motivation. The declarations were not made immediately *at the time* of the walkout, and they were not made to the employer. To the contrary, it should suffice, in rejecting this argument to say that there is substantial evidence that the maids did not voluntarily quit their employment, but rather walked off their jobs for the purpose of presenting demands and grievances. Elam v. NLRB, 129 U. S.App.D.C. 388, 395 F.2d 611 (1968). It was, therefore, clearly within the Board's authority to lightly weigh the reporter's testimony. Credibility of witnesses and inferences to be drawn from the evidence are primarily for the determination of the National Labor Relations Board, and the power of review is

1. The opinion does appear to give credence to the idea, but the court did not explicitly state such. Furthermore, it appears that all the findings in *Plastilite* were based on far more substantial unfair labor practices to which the supervisory dismissal merely had a casual link; it was the trigger.

more an assessment of the record rather than a new trial. NLRB v. St. Clair Lime Co., 315 F.2d 224 (10th Cir. 1963). The court will not substitute its judgment for that of the trial examiner, who heard the testimony and observed witnesses, or that of the National Labor Relations Board. National Labor Relations Act § 8(a)(1) and (3) as amended, 29 U.S.C. § 158(a)(1) and (3), NLRB v. Lively Service Co., 290 F.2d 205 (10th Cir. 1961).

■ Considering that the maids conduct was a protected concerted activity for their mutual benefit under section 7 of the Act, 29 U.S.C. § 157, and that they did not quit, they remain employees entitled to relief through reinstatement. Striking workers remain "employees" entitled to protection of the national labor laws. National Labor Relations Act, § 2(3), as amended, 29 U.S.C. § 152(3); NLRB v. Hartmann Luggage Co., 453 F.2d 178 (6th Cir. 1971). At this point the respondent prefaces the maids' right to reinstatement on the nature of the offer made for it. Respondent contends that if the request for reinstatement is not clearly and absolutely unconditional the employer need not reply to it, let alone act upon it.[2] The Company made no response to the reinstatement letter and the picketing continued at the motel for well over a year after the offer was made. At the time of the hearing, none of the maids had been reinstated although eight new maids were hired after the unconditional offer was made. In support of its contention, respondent cites H. & F. Binch Co. Plant of Native Laces and Textile Division of Indian Head, Inc. v. NLRB, 456 F.2d 357, 364 (2d Cir. 1972) with the analogy that the offer presented in this case was the same type of group offer and that everything the strikers did here was calculated to give the employer the impression that their demands were for simultaneous reinstatement of all. It is further contended that it should not be until the employees individually request reinstatement that the employer could know that they had abandoned the previously held position. We do not agree that this situation is similar to the one cited in *Binch, supra*. The maids did not march into the hotel *en masse* to resume their jobs, as the employees did in the *Binch* case, as if nothing had happened. Secondly, throughout the *Binch* case it is evident that the employer tried to conduct itself in a manner consistent with the law. In *Binch*, the company did try to accommodate the strikers. It actively approached a number of strikers on an individual basis to arrange for a return to work. Furthermore, the initial back-to-work message sent by the strikers to management was absolutely conditional on its face.[3] The message in the present case tends toward the other end of the spectrum. Here the only evidence of a conditional nature regarding the return to work arose shortly after the walkout began when Maylen met with Braasch to submit a list of demands. Subsequent testimony indicates each maid individually had a willingness to return to work provided that all of them decided it was the proper thing to do. It does not appear to be a willingness predicated on everyone getting her job back, but a willingness to return provided there was no breach of faith with the other members of the group.

2. On September 3, the Union sent a letter to Braasch, signed by all but one of the maids, stating as follows:

"We, the undersigned, hereby request that we be reinstated to our former positions with Holiday Inn of Henryetta. This is an unconditional offer to return to work. Please advise representatives of the Retail Clerks Union, Local No. 73, Tulsa, Oklahoma, of your position in this matter."

3. In the *H. & F. Binch case, supra* at 360, the offer read:

"This is to advise you that all the employees now on strike offer to return to work immediately provided you agree to take everyone back without discrimination. All employees are willing to return provided you are willing to agree not to discriminate against any workers including the Raschel workers for the protest walkout concerning the change in working hours and your failure to discuss same."

The employer has the burden of showing that the offer to return to work was not unconditional. H. & F. Binch Co. Plant v. NLRB, *supra*.

The respondent cites an impression that the offer was conditional on the return of all the employees. But nowhere is evidence cited to affirm or dispel this "impression." It does not appear to have been beyond the employer's means to have inquired into what "[w]e, the undersigned" meant or to have solicited the employees individually to discover th true meaning of the letter. Rather than make a reasonable effort to clarify the situation, the employer embarked on a course of unfair labor practices toward workers remaining on the job that perpetuated a long and painful labor dispute contrary to the Act's intent. Based on the facts and circumstances, the employer has not borne the burden of proof to show that the offer was less than unconditional. To accept the employer's contention in this case that the request for reinstatement was less than unconditional and that, therefore, the employer's inaction was justified would do great damage to the intents and purposes of the Act.

██ It is the Board's responsibility to strike a balance between the exigencies of business and the invasion of employee rights in the light of the Act and its policies. NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 33–34, 87 S.Ct. 1792, 18 L.Ed.2d 1027. *See also*, NLRB v. Erie Resistor Corp., 373 U.S. 221, 228–229, 235–236, 83 S.Ct. 1139, 1145, 1149, 10 L.Ed.2d 308 (1963); NLRB v. Hartmann Luggage Co., *supra*.

██ The court finds the Board's decision for reinstatement is supported by both substantial evidence on the record taken as a whole and a strong body of precedent. NLRB v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381; NLRB v. Great Dane Trailers, Inc., *supra;* NLRB v. Fleetwood Trailer Co., Inc., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); Laidlaw Corporation v. NLRB,

414 F.2d 99 (7th Cir. 1969), cert. denied 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970).

The third violation found by the Board was that the Company violated section 8(a)(3) and (1) of the Act by discharging five employees because of their Union adherence.

The record respecting the above shows that the Company discharged five employees, all Union members, active in the Union to varying degrees, with the explanation that a general layoff was required due to a reduction in business. The employees were discharged in the middle of a pay period, approximately two weeks after the Union requested recognition. Prior to, this situation employees were not laid off because the high rate of employee turnover generally remedied the situation. Employees with less seniority were retained and subsequent to the layoff new employees were hired to do similar work. The Board found that all five of the discharged employees were Union supporters who performed their jobs with the requisite competency. No evidence was presented to show that they performed unsatisfactorily. The record is to the contrary, showing that several of the employees were complimented on occasion for their good performance. According to the record, none of the discharged employees were ever criticized, reprimanded or found legitimately deficient prior to their discharge. The cases respondent cites to support the claim that the Board did not have substantial evidence to negate the discharge either turned on whether the testifying employee had credibility (NLRB v. Texas Industries, Inc., 387 F.2d 426 (5th Cir. 1967), employee lacked credibility and abused work rules) or was an adequate performer for the purpose employed (NLRB v. Ogle Protection Service, Inc., 375 F.2d 497, 506 (6th Cir. 1967), one employee appeared to consistently perform unsatisfactorily and the other repeatedly appeared at work with the odor of liquor on his breath). The credibility of the witnesses is generally a matter

for the determination of the hearing examiner and the Board. Keener Rubber, Inc. v. NLRB, 326 F.2d 968 (6th Cir. 1964), cert. denied, 377 U.S. 934, 84 S. Ct. 1337, 12 L.Ed.2d 297.

The record also shows that these discharged employees signed a Union petition, they signed a Union card, they all attended meetings (some very actively) they all voted for the Union and they all had their ballots challenged. Several of the discharged employees were under the immediate control of Ruth Louchery whose activity, the record shows, was blatantly directed toward discouraging Union sentiment in ways contrary to the confines of the Act.

One employee, Dorothy Bond, was questioned by her supervisor and warned of reprisal if she associated with the strikers. Her supervisor inferred, when she was laid off, that it was the direct result of Union activity. Another employee, Myrtle Mouser, was threatened by her immediate supervisor that if she signed a Union card she would be fired. The Board inferred, based on the record taken as a whole, the layoffs were retaliation for Union endorsement and, therefore, in violation of section 8(a)(3) and (1) of the National Labor Relations Act, as amended, *supra*.

Respondent claims the Board has not met its burden of proof in making this finding because the Board's inferences of discriminatory motivation were based on circumstantial evidence that did not specifically state whether the employees' activities were protected, whether the employer had knowledge of these activities, and that the activities were the primary reason for the employee discharge.

The General Counsel has the duty to establish by acceptable substantial evidence on the whole record, that the discharge came from the forbidden motives of interference in employee statutory rights. NLRB v. McGahey, 233 F.2d 406 (5th Cir. 1956). The employees' activities directed toward achieving equitable work loads and Union representation were clearly protected under section 8(a)(3) and (1) of the

Act. The "substantial evidence" necessary to support findings of the National Labor Rleations Board constitutes evidence furnishing a substantial basis in fact from which the fact in issue can reasonably be inferred. Dubin-Haskell Lining Corp. v. NLRB, 375 F.2d 568, 573 (4th Cir. 1967). The law requires evidence that extends beyond mere suspicion, that amounts to more than a mere scintilla. Dubin-Haskell Lining Corp. v. NLRB, *supra*. However, it is not, as respondent contends, always necessary for the Board to explicitly show beyond a reasonable doubt that the employer had absolute knowledge and was completely aware of the discharged employees close connection to the Union. In this case the record taken as a whole reasonably permits the Board's fair inference of discriminatory motivation. Universal Camera Corp. v. NLRB, *supra*. Where there is substantial evidence, direct or circumstantial, to indicate that an employee was discharged for Union activities, a very definite burden is imposed on the employer to prove existence of a reason, not within the Act's provisions, sufficient to warrant the discharge. NLRB v. Entwistle Manufacturing Co., 120 F.2d 532 (4th Cir. 1941). There is not an iota of evidence in the record to show that the discharged employees were ever inadequate in their service to the Okla-Inn. There is substantial evidence in the record from which it can be reasonably concluded that the Company's primary motivation in unlawfully discharging the employees was to affect membership in the activities on behalf of the Union. NLRB v. Ogle Protection Service, Inc., *supra*.

These specific uncontroverted management activities, coupled with numerous other incidents taken from the record as a whole, demonstrate substantial evidence to support the Board's findings. The scope of the court's review in unfair labor practice cases is limited to determining if the record contains substantial evidence to support the Board's findings. We find that it does. National Labor Relations Act, § 10(e), as amended, 29

U.S.C. § 160(e) ; NLRB v. Ogle Protection Service, Inc., *supra;* Universal Camera Corporation v. NLRB, *supra.*

The next violation found by the Board was that the Company violated section 8(a)(3) and (1) of the Act by changing the conditions of employment of DeLois Porter and by discharging her because of her Union adherence.

We find the record supports this finding. In determining whether an employee's working conditions have been changed or his employment terminated for discriminatory reasons, it is necessary to assess "the degree of significance to be given to the employer's explanation" and to infer from all the available evidence whether the stated explanation is the real reason or merely a pretext to mask anti-union motivation. NLRB v. Automotive Controls Corporation, 406 F.2d 221, 226 (10th Cir. 1969) ; *American Sanitary Products Co. v. NLRB,* 382 F.2d 53–56 (10th Cir. 1967) ; *Betts Baking Co., Inc. v. NLRB,* 380 F. 2d 199, 204 (10th Cir. 1967).

It is well settled that where the facts are open to conflicting inferences the Board's choice may not be set aside "even though the court would justifiably have made a different choice had the matter been before it *de novo*." NLRB v. Automotive Controls Corporation, *supra,* 406 F.2d at 226; *see also,* Universal Camera Corporation v. NLRB, *supra;* NLRB v. St. Clair Lime Co., *supra.*

In the instant case, there is ample evidence to support the Board's finding that the Company changed Porter's shift so that she would have to work regularly from 3–11 p. m. and on Sundays, assigned her burdensome filing work and restricted her normal activities, because of her avowed Union adherence, and that it then discharged her when she refused to quit. Porter's Union activities attracted both the attention and antipathy of the Company. Porter signed a Union authorization petition on August 18, attended several Union meetings and informed Innkeeper Braasch in each instance that she had done so. On October 16, Braasch asked Porter why she was walking out there with the picketing maids, whom Braasch described as "sorry sons of bitches" and in November he told her that "the Inn would close before the Union would come in." In December, Supervisor Louchery warned Porter that she would lose her job if she voted for the Union and the Company found out about it. In January, Louchery flatly stated to employee Ashley that if the Union lost the election, Porter would be discharged.

Within a week after the election, the Company began carrying out its previously articulated determination to rid itself of Porter. On February 16, Braasch advised Porter that she would no longer work rotating shifts but would be required to regularly work from 3–11 p. m., including Sundays. On February 18, he added filing work to Porter's duties, stating, "I'll make you wish you had quit." On March 1, he placed Porter on strict probation and forbade her to talk to other employees or leave her desk for anything. The following day he told Porter that she could go to the bathroom once during her shift. He then proceeded to lay the groundwork for Porter's discharge by placing in her personnel file an unsupported statement that Porter told numerous employees, "cooks, waitresses and the cashier" that he was intoxicated the previous Saturday night. Porter then underwent treatment for acute anxiety and on March 12 obtained a two-month leave of absence from the Company. On April 22, when Porter showed Braasch her doctor's written release to resume work, Braasch said "OK," adding that he would be in touch with her in a couple of days. On April 27, however, the Company's attorney informed Porter by letter that because of unidentified "circumstances of your own making" she would not be permitted to return. On these facts, the Board properly found that the Company changed Porter's working conditions and then discharged her because of her Union advocacy, in violation of section 8(a)(3) and (1) of the Act. NLRB v. Champa

Linen Service, 437 F.2d 1259 (10th Cir. 1971); Santangelo & Co. v. NLRB, 364 F.2d 979, 981 (10th Cir. 1966); NLRB v. Lowell Sun Publishing Co., 320 F.2d 835, 840 (1st Cir. 1963).

Finally, the Board found that the Company violated section 8(a)(5) and (1) of the Act by refusing to recognize and bargain with the Union and that a bargaining order was warranted. The threats of dismissal, reprisal, business shut-down, the offer of reward to an employee of a certain position if the Union did not get in, the discharge of five Union adherents, the intimidation and discharge of DeLois Porter, the persistent interrogation of employees, the evidence of active and persistent surveillance and the Union's evidence of thin majority support put this case squarely into the first category of cases cited in *Gissel* that warrant a bargaining order. NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). The Company was clearly in violation of section 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(5), as amended.

We quote the narrower rule of the Fourth Circuit used by the Supreme Court in *Gissel, supra,* to approve a bargaining order in even less extraordinary cases marked by less persuasive practices which also have the tendency to undermine majority strength and impede the election process.

> * * * the Fourth Circuit nevertheless left open the possibility of imposing a bargaining order, without need of inquiry into majority status on the basis of cards or otherwise in "exceptional" cases marked by "outrageous" and "pervasive" unfair labor practices. Such an order would be an appropriate remedy for those practices, the court noted, if they are of "such a nature that their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot

be held." [*Gissel, supra;* NLRB v. S. S. Ligan Packing Co., 386 F.2d 562, 570 (4th Cir. 1967); *see also,* NLRB v. Heck's Inc., 398 F.2d 337, 338 (4th Cir. 1968).]

It should be noted that in the present case a bare majority status existed, 26 of 48 employees possessed Union authorization cards, and therefore the bargaining order would also be justified under the second category of *Gissel, supra,* 395 U.S. at 614, 89 S.Ct. 1940:

> * * * the Board's use of the bargaining order in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes. The Board's authority to issue such an order on a lesser showing of employer misconduct is appropriate, we should reemphasize, where there is also a showing that *at one point* the Union had a majority; in such a case, of course, effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior. In fashioning a remedy in the exercise of its discretion, then, the Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. If the Board finds that the possibility of erasing the effects of past practices and of insuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, than such an order should issue. [Emphasis added]. [*See also,* NLRB v. Scoler's Inc., 466 F.2d 1289, 1293 (2d Cir. 1972).]

The Board's application for enforcement of its order is granted. A judgment shall be entered accordingly.