HENNING & CHEADLE,
INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 74–1756, 74–1891.

United States Court of Appeals,
Seventh Circuit.

Argued May 22, 1975.

Decided Sept. 16, 1975.

Richard J. Walsh, Chicago, Ill., for petitioner.

Elliott Moore, Deputy Assoc. Gen. Counsel, Marjorie S. Gofreed, William F. Wachter, Attys., N.L.R.B., Washington, D.C., for respondent.

Before CUMMINGS, TONE and BAUER, Circuit Judges.

PER CURIAM.

This case arises on the petition of Henning & Cheadle, Inc. ("the Company") to set aside an order of the National Labor Relations Board issued on August 8, 1974. The Board has filed a cross-petition requesting enforcement of the order. Its decision and order, as well as that of the Administrative Law Judge, are reported at 212 NLRB No. 109.

The Board and the Administrative Law Judge found that the Company discharged employees Pat Barac and Pasquala Sosa in the mistaken belief that their November 14 and 15, 1973, absence from work was the result of a concerted work stoppage designed to protest "Respondent's [the Company's] supervisory policies." The Board found that if such a work stoppage had occurred, it would have been protected by Section 7 of the National Labor Relations Act (29 U.S.C. § 157) because the identity and capability of the supervisor had a direct impact on those employees' job interests. The Board concluded that the Company violated Section 8(a)(1) of the Act (29 U.S.C. § 158(a)(1)) by discharging the two employees because of the firing supervisor's mistaken belief as to the reasons for the employees' absence from work. Our task is to determine the propriety of the Board's findings and its resultant conclusion that the Company had committed an unfair labor practice.

The findings of the Administrative Law Judge were affirmed by a majority of the three member panel of the Board. The following summary of the evidence is drawn from his and the Board's findings:

On October 1, 1973, Henry Tanner was appointed Data Control Manager of the Company's 10000 Greenfield Street establishment in Detroit, Michigan.[1] His responsibility included supervision of the data entry department involved here. That department employed about 18 full-time and three or four part-time office machine operators on two overlapping shifts between 8:00 a. m. and midnight. The department was then supervised by Valerie Grant, and cutoffs on its work occurred usually on the 14th and 30th of each month. The department had a deadline of noon the following day for completing its work. However, the department was frequently unable to meet those deadlines.

On Thursday, October 11, Tanner asked Grant whether her department would be able to meet the Saturday, October 13, deadline and was assured that the work was on schedule. However, the work was not completed until Monday, October 15. Apparently Tanner's criticism of this failure and of Grant's supervisory policies triggered her resignation on Monday afternoon, October 15, effective November 2.

On the afternoon of October 15, Grant told the employees in her department that she was resigning because of Tanner's attitude and because the Company had not acceded to her request for better wages and working conditions for the employees in her department.

On the morning of October 16, the employees in this department discussed the possibility of a protest walkout because of Grant's resignation and general conditions in the department. There was not enough support for a walkout, but the employees decided to seek a meeting with Tanner. At the meeting, he told them that he and Grant had discussed her production shortcomings and her failure to meet the October 13th dead-

---

1. The Company's business within this Circuit supports this Court's jurisdiction of the matter. See 29 U.S.C. § 160(e).

line. He also told them that he had heard the department was not operating efficiently under Grant, that the employees did not keep regular hours, and that Grant was "too easy on them." The employees defended Grant and asked Tanner to persuade her to reconsider her resignation. However, he did not persuade her to stay.

On November 1st, Tanner hired Ginger Hammond as the new supervisor of this department. Hammond tightened up disciplinary procedures and told the employees they must meet the bi-monthly deadlines.

The first deadline for the department after Hammond's employment was November 15. In order to meet that deadline, Hammond requested volunteers to work overtime on November 14. One of the three volunteers, Pat Barac, offered to work four extra hours until midnight.

During her November 14th supper break, Barac attended a party for former supervisor Grant at a nearby cocktail lounge. Pasquala Sosa was also present. They and several other employees had too much to drink. Sosa indicated that it was unlikely she would be able to report to work the following day. Barac and two other employees each bet Sosa two dollars that Sosa would show up the next morning, despite her condition at that moment. Barac did not return to work that night.

On November 15th, Sosa called in sick and Barac, who was not scheduled to arrive at work until 12:00 n., called in to find out whether she had won her bet. Later that morning, Barac also called in sick and was told by Hammond that she was fired. Hammond testified that she told Barac she was aware of the prior evening's bet and she knew Barac was not sick and that Barac was aware of the November 15th deadline. When Sosa called in sick again the following morning she was terminated by Hammond for the same reasons.[2] When

Hammond discussed the discharges with Tanner, she expressed the view that the employees were trying to get her to quit.

The Board held that whether the supposed concerted action of Barac and Sosa was considered as harassment by Hammond was unimportant because the evidence indicated that she also considered it a protest directed at her supervisory policies. Citing *Dobbs Houses, Inc.*, 135 NLRB 885 (1962), the Board majority reiterated the view there expressed that concerted action by employees to protest an employer's selection or termination of a supervisory employee is protected action under the Act where "the identity and capability of the supervisor involved has a direct impact on the employees' own job interests" (135 NLRB at 888).

The Board also held that although the Company would have been entitled to dismiss Barac and Sosa for failing to report, respectively, on the evening of November 14 and on November 15, Hammond's decision to terminate them was caused by her belief that concerted activity had occurred. The Board correctly noted that the Act is violated if an employer acts against the employees in the belief that they have engaged in protected activities, whether or not they actually did so. See *National Labor Relations Board v. Link-Belt Corp.*, 311 U.S. 584, 589–590, 61 S.Ct. 358, 85 L.Ed. 368; *National Labor Relations Board v. Ritchie Manufacturing Co.*, 354 F.2d 90, 98–99 (8th Cir. 1965). If, however, the Company acts upon erroneous information that, if true, would justify its conduct, no violation of the Act occurs. See *National Labor Relations Board v. Charles J. Kaye*, 272 F.2d 112, 114 (7th Cir. 1959). The Board majority concluded as follows:

"We conclude, then, that employees Barac and Sosa were terminated because of Hammond's erroneous belief that they had engaged in a concerted

---

2. Employees Vikki Kapanowski and Gail Blackburn had attended the November 14th party for Grant and were also absent from work on November 15th. They are not involved in this case.

work stoppage in protest over Respondent's supervisory policies, that the identity and capability of their supervisor had a direct impact on their conditions, and that such a work stoppage, had it actually occurred, would have constituted protected activity under Section 7 of the Act."

Member Kennedy dissented on the ground that the General Counsel of the Board had not established by substantial evidence that "Hammond *believed* that the employees were engaged in protected concerted activity by not reporting back to work on November 14 and by not reporting for work on November 15, and that *but for* that belief the employees would not have been terminated."

Member Kennedy noted that in Hammond's statements about the firing of Barac and Sosa, Hammond had told them she knew they were not sick and that they were taking time off to keep the department from meeting its deadlines and to harass her to force her to quit. Member Kennedy closed his dissent by stating:

"It seems to me unrealistic speculation to say, as the majority does, in effect, that but for Respondent's belief that the girls were acting in concert to protest Respondent's supervisory policies they would not have been discharged for getting drunk and not reporting to work. I think most employers confronted with a similar situation would fire the employees. Before I would be prepared to affirm the majority's finding, I would have to see some evidence that Respondent previously tolerated such misconduct by its employees. I know of no such evidence in this case."

The actual activity of the employees was neither concerted nor done for the purpose of mutual aid or protection; thus it was not protected activity and under the Act they could be lawfully discharged for their conduct.[3] As both parties agree, the key question is what did supervisor Hammond believe about the purpose of the employees' conduct? The Company concedes that Hammond thought, albeit erroneously, that the employees had coordinated their activity, so that she thought their failure to appear at work at the designated times was concerted activity within the meaning of the Act. The question therefore becomes whether the admittedly concerted activity, had it actually occurred as Hammond perceived, would have been protected under the Act.

The parties disagree on the exact nature of Hammond's crucial beliefs. Assuming, as the Board found, that Hammond believed that the employees' actions were in protest of the Company's supervisory policies in substituting supervisors and the accompanying changes in the department and that Hammond felt "harassed" by the employees and thought that they were "trying to make it rough on her," we hold that such activities would not have been protected under the Act.[4]

---

**3.** Section 7 defines the protected activities of employees. It provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title." (29 U.S.C. § 157.)

Section 8(a)(1) provides:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." (29 U.S.C. § 158(a)(1).)

**4.** The Company's brief in this Court is directed, in large part, to persuading us that the Board's finding with respect to Hammond's beliefs about the employees' activity is unsupported by substantial evidence in the record as a whole. While the Company's arguments are well taken, we deem it unnecessary to overturn the Board's findings of fact in deciding

■ In situations such as the one Hammond perceived here, the general rule before both the Board and the Courts is that "employees who engage in a walkout because of a dissatisfaction with a change in foreman, are not protected by the Act and are subject to discharge." *American Art Clay Co. v. National Labor Relations Board,* 328 F.2d 88, 90 (7th Cir. 1964); *National Labor Relations Board v. Reynolds International Pen Co.,* 162 F.2d 680, 683–684 (7th Cir. 1947); cf. *Joanna Cotton Mills Co. v. National Labor Relations Board,* 176 F.2d 749, 753 (4th Cir. 1949). However, since *Dobbs Houses, Inc.,* 135 NLRB 885 (1962), was decided, the Board has considered concerted activity over changes in supervisory personnel protected, provided the identity and capability of the supervisor have a direct impact on the employees' job interest.

This Circuit, in *National Labor Relations Board v. Phoenix Mutual Life Insurance Co.,* 167 F.2d 983 (7th Cir. 1948), recognized the limited right of employees under the Act to engage in concerted activity with respect to the discharge of a supervisory employee even before *Dobbs Houses* was decided by the Board. Indeed, the Board's decision in *Dobbs Houses* relied on our *Phoenix Mutual* case. In *American Art Clay Co., supra,* however, Judge Duffy, who also wrote the *Phoenix Mutual* opinion, explained the *Phoenix Mutual* case in holding that the concerted activity of employees protesting a change in supervisory personnel, which affects their job interests, is

not protected under the Act if the character of the concerted activity is intemperate.[5]

Similarly, in the Fifth Circuit's review of the Board's decision in *Dobbs Houses* (*Dobbs Houses, Inc. v. National Labor Relations Board,* 325 F.2d 531, 537–539 (5th Cir. 1963)), the Court held that in order to be protected under the Act, concerted activity over changes in supervisory personnel must be reasonably related to the ends sought to be achieved. 325 F.2d at 538–539. The Fifth Circuit vacated the Board's order in *Dobbs Houses,* holding that the employees' concerted activity was not protected under the Act because the walkout which occurred there "was an unreasonable way to make known their concern to the employer over their mistaken belief that [their supervisor] had been discharged." 325 F.2d at 539. That opinion relied heavily on the relevant cases from this Circuit, particularly *Cleaver-Brooks Manufacturing Corp. v. National Labor Relations Board,* 264 F.2d 637 (7th Cir. 1959), certiorari denied, 361 U.S. 817, 80 S.Ct. 58, 4 L.Ed.2d 63, where the moderate character of the concerted activity in *Phoenix Mutual* was first emphasized as a factor in the decision that the employees' concerted activity there was protected under the Act. Subsequently, our *American Art Clay* case followed the Fifth Circuit's *Dobbs Houses* decision.

■ Hammond clearly thought that the employees were acting concertedly in

this case. The Board's opinion clearly indicates that it regards this case as one involving the question of what activities are protected when employees protest their employer's supervisory policies in substituting one supervisor with another.

The General Counsel contended before the ALJ that Hammond believed that the employees' purpose in failing to appear at work at the proper times was "to embarrass [Hammond] and to cause [the Company] to miss the November 15 deadline about which Mrs. Hammond was concerned." ALJ's decision at 5. The ALJ's findings, which were adopted by the Board, accepted this contention of the General Counsel, finding that Hammond believed that

the "employees resented [Hammond's] firmness as a supervisor after the laxity of Mrs. Grant and on the morning of the 15th believed that the employees were engaged in a concerted work stoppage. I conclude and find that for this reason every employee who was off on the 15th was summarily discharged by Mrs. Hammond." ALJ's decision at 6. It is in this context that we decide the case.

5. There was no walkout or strike in *Phoenix Mutual.* Two salesmen had merely composed a first draft of a letter to management with respect to the resignation of the company's cashier and her successor. They were fired for this activity.

response to the "forced" resignation of the supervisor, who had been very lenient with the employees and who had advocated increased wages and other benefits for the employees, and in response to the replacement of that supervisor with one whose policies were not so lenient. The case law in this Circuit is clear that the employees are entitled to the protection of the Act if they act concertedly to make known their views on the change in supervision to their employer. *Phoenix Mutual Life Insurance Co., supra.* Thus had the employees' request to Tanner for a meeting concerning Grant's resignation been met with disciplinary action, the Company would have infringed the employees' rights protected under the Act. Under *Cleaver-Brooks Manufacturing Corp., supra,* and *American Art Clay Co., supra,* however, a walkout or a campaign of sick calls at a time when the employees knew that there was a departmental deadline and knew that the supervisor regarded the meeting of the deadline as important is not protected activity under the Act.[6] Since Hammond acted with the belief that such a campaign had been launched by the employees when she fired the two complainants, she did not act with a belief that the employees were engaged in activity to which the Act affords protection. Therefore, under the relevant line of precedent, no unfair labor practice was committed by Hammond or by the Company.

Accordingly, the Company's petition to vacate is granted and the Board's cross-petition for enforcement is denied.

---

**6.** The Board relies on the decision in *National Labor Relations Board v. Okla-Inn,* 488 F.2d 498 (10th Cir. 1973). The Court there recognized the principle that the activity, in order to be protected under the Act, must be "reasonable relative to the circumstances involved."

488 F.2d at 503. On different facts than those presented here, the Court then held that the walkout of the employees was protected because it was "primarily due to poor work conditions." *Idem.* The *Okla-Inn* case is no aid to the Board here.