# NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

# TULSA DIVISION, BYRON JACKSON PUMP DIVISION, BORG–WARNER CORPORATION, Respondent.

No. 78–1273.

United States Court of Appeals, Tenth Circuit.

Argued Sept. 14, 1979.

Decided Nov. 1, 1979.

Howard E. Perlstein, Washington, D.C. (Nelson A. Levin, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D.C., on brief), for petitioner.

Carl D. Hall, Jr., Hall, Sublett, McCormick & Andrew, Tulsa, Okl., for respondent.

---

Before McWILLIAMS and LOGAN, Circuit Judges, and MILLER,* Judge.

MILLER, Judge.

Pursuant to section 10(e) of the National Labor Relations Act ("Act"), as amended (29 U.S.C. § 160(e)), the National Labor Relations Board ("NLRB") has applied to this court for enforcement of its order issued against the Tulsa Division, Byron Jackson Pump Division, Borg-Warner Corporation ("Company") on March 8, 1978. The issue presented is whether substantial evidence in the record as a whole supports the finding of the NLRB (three-member panel)[1] that the Company violated sections 8(a)(3) and (1) of the Act (29 U.S.C. §§ 158(a)(3) and (1))[2] by changing its early in-early out practice involving the Company's six test technicians because of their union activities. The NLRB's findings of section 8(a)(1) violations with respect to other activities of the Company and the portions of its order pertaining thereto are not at issue.

## BACKGROUND

At the time the testimony was taken in this case before the Administrative Law Judge ("ALJ") in 1977, the Company had about 730 employees, of whom some 550 were employed in the manufacturing division. These included two dispatchers and three expediters whose duties were to see that the 6,000 parts processed at the plant were directed from one production employee's work station to another, so that no employee would run out of work. They were not bargaining unit employees but

were part of the unit that the United Auto Workers of America ("UAW") had petitioned for in 1976. The six test technicians were employed in the engineering division. Pat Burns was in overall charge of the manufacturing division, and Clint Boyd was in overall charge of the engineering division. The chain of supervisory command down to the test technicians was from Boyd to Eldon Drake to Stan Claibourn to Don Workman. Four of the six test technicians, Lynn Hudson, Jim Wyse, Doilis Taylor, and Vance Bates, were active in the UAW's organizing campaign commencing in October of 1976 and continuing until an NLRB election January 28, 1977.

In early November of 1976, Claibourn, who was serving on jury duty, stopped at the plant and learned from Workman that union activities were going on there. On November 11, when he returned to work at the plant, he interrogated employees about their union activities; on November 23, Drake told employees that the Company knew which department originated the union activities and what the employees were doing; on the same day, according to technician Wyse, Workman told him, during a conversation about union activities, that he had been asked "to watch us 100 percent of the time"; and also on the same day, Workman ordered employees to remove union insignia from their hard hats.[3] We note that the ALJ, whose findings, reasons, and conclusions were almost totally affirmed by the NLRB, observed that the testimony of Hudson, Wyse, Taylor, and Bates was uncontroverted, adding:

It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

. . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization

. . . .

(Chi.) L.J. 789, 802–03 (1977); [1978] Empl. Prac. Guide (CCH) ¶ 1354.

* The Honorable Jack R. Miller, Judge of the United States Court of Customs and Patent Appeals, sitting by designation.

1. The NLRB's opinion is reported at 234 N.L.R.B. No. 189. One of the panel members dissented with respect to the issue presented on this appeal.

2. 29 U.S.C. § 158(a) provides in pertinent part as follows:
   (a) *Unfair labor practices by employer*

3. These are four of the other section 8(a)(1) violations found by the NLRB which are not at issue.

The Respondent did not cross-examine any of these witnesses following their direct testimony. I found these technicians to be sincere, intelligent witnesses, and I credit their testimony throughout the case.

All but one of the test technicians worked a regular shift from 8 a. m. to 4:30 p. m. However, it was a long-established practice[4] that if a technician had a legitimate reason for leaving early, he could request permission from Workman or Claibourn to come in early and leave early, and permission would routinely be granted. Hudson testified that, nevertheless, when he telephoned Workman on the evening of January 12, 1977, and requested that he be permitted to report early the next day so that he could leave early to take his wife to an appointment with her doctor, Workman denied the request and told him that the practice was discontinued; that when he asked Workman why, "he just stuttered and said he better not say. And I asked him was it because of the UAW drive, and he again said he better not say." As found by the ALJ:

On the next day, Technicians Bates, Wyse, Hudson, Duane Hale and Taylor were together in the lab. Taylor testified that Workman came down to the lab "and told us that the policy [early in-early out] had been changed, that we couldn't do it anymore." When asked by General Counsel if Workman gave any reason Taylor responded that Workman said "that it was against the law, more or less." Workman, who was still employed by the Respondent at the time of the hearing, did not testify, and no explanation was offered as to why he did not testify.

Bates testified that·on the same day, Workman notified him that no one would be allowed to come in early without a supervisor being present at the same time. Bates had been taking his asthmatic son to the doctor's since the spring of 1976, and utilized the early in-early out practice by coming in at 7 a. m. and leaving at 3:30 p. m., an hour ahead of his regular quitting time. Following Workman's statement of the change in policy, Bates had two occasions to take his son to the doctor's, which he did by coming in at the regular time and leaving an hour early, thereby losing an hour each day.

Wyse testified that prior to the union organizing drive the technicians received light supervision. "Workman would come through three or four times a day to explain what he would want done, and that was the extent he would supervise us." Hudson testified that Workman occasionally came into the lab, but that normally he was not present more than three hours of an eight-hour period.

Burns testified that in early November of 1976 it was brought to his attention by the manager over the expediters and dispatchers that the test technicians were coming into the manufacturing area and were interfering with the expediters and dispatchers in their work; that he personally observed the technicians, primarily Bates and Hudson and occasionally Wyse, spending a lot of time out of their area and in the manufacturing area during normal working time and carrying on conversations with the expediters and dispatchers; and that such activity developed "bottlenecks." According to his testimony, he went to Claibourn and requested that he keep the technicians out of the manufacturing area and in the area of his own responsibility because they were interfering with operations; that the situation continued and he then went to Drake, who was over Claibourn, and complained to him; that there seemed to be a pause in the activity, but it then continued; that he finally went to Boyd, the top management official over the engineering division, and "I told him point blank I wanted him to keep these people out of the manufacturing area . . . . I told him they were interfering with the operations . . . ."; that "He assured me that he would take the action to Mr. Claibourn, and . . . we did see a change in the amount of time that they were

---

4. Claibourn testified that the practice had continued from as early as 1966.

in the manufacturing area"; that he did not know about the early in-early out practice involving the test technicians (which was not a Company-wide practice) until the complaint in the case was filed (in March of 1977); and that he knew about the UAW organizing campaign at the time of the above related conversations, but that concern about the campaign was not one of the reasons he tried to put an end to the activities of the test technicians in the manufacturing area. Burns was asked on cross-examination whether he had any idea what was being discussed in the conversations between the test technicians and the expediters and dispatchers. He replied: "I am sure from the standpoint—there are a lot of things that could have been discussed, but I have no idea." [5]

Boyd testified that in Late November or December of 1976 Burns brought to his attention that the test technicians "were spending an unusual amount of time out of their area and that they were interfering with the work of the dispatchers and expediters in the manufacturing [area]"; that he had Drake and Claibourn come to his office, told them about it, and "asked them at that time to have Don Workman to make sure that he stayed down on the floor 100 percent of the time, which was his work station, and see that these people stayed in their area and performed the duties that they were being paid to do, except for the normal breaks that they were entitled to." Like Burns, he stated that he did not know about the early in-early out practice involving the test technicians until the complaint in the case was filed; also, that he had never directed Claibourn or anyone else under his supervision to discontinue or modify that practice.

Claibourn corroborated the testimony of Burns and Boyd. In mid-November, Burns complained to him, and he then told Workman about the complaint and told Workman "to stay on the floor and keep these technicians in their area and working." In December he was called to Boyd's office,

along with Drake, and "rather severely reprimanded for the very loose supervision that we had allowed in the test lab . . . . I was informed that my test technicians were still roaming around the manufacturing area talking to the dispatchers and . . to the expediters. . . . And he wanted them back in the test lab. He told me to have Don Workman spend 100 percent of his time in the test lab and supervising these test technicians." Claibourn related what he told Workman following the meeting in Boyd's office:

> Yes, I called Don Workman up again and told him that I had just gotten a very bad chewing out from Clint Boyd, that our people were abusing the privileges that they had.
>
> I told him that he was to spend 100 percent of the time in the test lab, and that the technicians were to be supervised 100 percent of the time.

He then related a conversation with Workman in late December:

> Workman came to me and asked me what he should do if the technicians requested to come in early and leave early.
>
> And I told him that if he was scheduled for overtime that the technicians in question could come in, but if he was not scheduled for overtime, Don Workman was not scheduled for overtime, then the technicians could not come in since the technicians had to be supervised 100 percent of the time.

## OPINION

We agree with the NLRB that the General Counsel established a prima facie case of violation of sections 8(a)(3) and (1) by the Company's change ("emasculated" is how the ALJ put it) in the early in-early out practice relative to the test technicians. Substantial evidence in the record as a whole supports the following statement of the NLRB:

> cians talked "Only about the product line" (business) when conversing with the expediters and dispatchers during their work time.

---

5. Claibourn also testified that he did not know what the conversations between the test technicians and expediters and dispatchers were about. Hudson testified that the test techni-

Inasmuch as Respondent had knowledge of the test . . . technicians' active involvement in the union campaign, as evidenced, *inter alia*, by its admission of several illegal interrogations and threats of reprisal to these employees, we cannot but conclude that its subsequent change in the early in-early out policy was motivated by a desire to insulate the technicians from other employees and thereby discourage union activity. Thus, regardless of the actual content of the conversations of the employees or respondent's knowledge thereof, we find that Respondent violated Sec. 8(a)(3) and (1) of the Act by curtailing an existing employment benefit of the technicians because of their union activities. . . .

This statement is reenforced by inferences reasonably drawn by the ALJ:

In ascertaining Respondent's real motive for drastically curtailing its policy of early in-early out, the statements of Don Workman are most revealing, and damaging to the Respondent's cause. On the evening of January 12, 1977 Hudson, a credible witness, had telephoned Workman for permission to come in early the next morning, only to be turned down because of the new policy; when Hudson asked why, Workman stuttered and added that he better not say. When Hudson pressed the point, and asked him specifically was it because of the UAW drive, his foreman again said he better not say. The next day, when Hudson talked with Workman at the plant about the policy change, Workman again dodged Hudson's plain question about the UAW drive, and again answered that he better not say.

The inference is reasonable that Workman knew that the policy had been changed because of the union organizing drive, and I draw that inference.[6] To the same effect, was Workman's reason given to the technicians . . . after he told them that the policy had been changed. Workman's stated reason to Taylor for the change in policy, "because it was against the law, more or less," given at the January 12, 1977 meeting . . . does not ring true, and I regard it as an evasive answer, made to avoid the true reason. The failure of the Respondent to call Workman as a witness, without any explanation, gives rise to the inference, adverse to the Respondent, that he would not contradict the testimony of Hudson and Taylor.

*International Union (UAW) v. NLRB*, 148 U.S.App.D.C. 305, 312–13, 459 F.2d 1329, 1336–37 (D.C.Cir. 1972), and cases cited; 2 *Wigmore on Evidence* § 285 (3d ed. 1940); see *United States v. Latimer*, 511 F.2d 498, 502–03 (10th Cir. 1975).

The Company vigorously argues that the change in the early in-early out practice involving the technicians was a management prerogative and was not improperly motivated. Although Burns, who complained to Boyd about the activities of the technicians, and Boyd, who directed Drake and Claibourn "to have Don Workman spend 100 percent of his time in the test lab and supervising these test technicians," both testified without contradiction that they did not even know until later about the early in-early out practice, this does not prove absence of improper motivation of the Company.[7] Actually it was Claibourn who enlarged Boyd's directive in such a

6. Even if bad faith on the part of the employer is not established, a violation may be found if the effect of management's actions is necessarily coercive. *Federation of Union Representatives v. NLRB*, 339 F.2d 126, 129 (2d Cir. 1964).

7. The ALJ commented that, during his testimony, Burns was "in most instances straight forward," but was "evasive" when answering the question (on cross-examination) whether he had any idea what was being discussed between the test technicians and the expediters and dispatchers. However, Burns was not in

the chain of supervisory command over the engineering division, and it was Boyd who issued the original directive to Drake and Claibourn. Moreover, the NLRB declined to adopt the ALJ's finding that the technicians were in fact talking with nonunion expediters and dispatchers about union activities, saying that "The record does not substantiate such a finding." This court has stated that mere suspicions of unlawful motivation are not sufficient to constitute substantial evidence. *NLRB v. Meinholdt Mfg., Inc.*, 451 F.2d 737 (10th Cir. 1971).

way as to change the early in-early out practice. Thus, the ALJ found:

> It was Claibourn who enlarged Boyd's instructions, and took it upon himself to tell Workman that the technicians were to be supervised 100 percent of the time. It was Claibourn who, when asked by Workman, what he should do with the technician's request that he be permitted to come in early and leave early, changed the long standing policy, and instructed Workman that the technicians could only come in early, if Workman was scheduled to come in early.

> I do not find that Burns or Boyd directed that the early in-early out policy be changed, but I do find that Claibourn effectuated the change, and as an agent of the Company, the Company is bound by his act. The record is clear that the Respondent [Company] was strongly antiunion, which, of course, is not an unfair labor practice, but in carrying out its antiunion campaign, it set about to restrict the technicians from engaging in union activity. One of its tools was to have its Supervisor Workman observe the technicians' movements at all times. As a consequence of this policy, the technicians lost their right to come in early, unsupervised. The loss of this right to come in early, without a supervisor present, was a by-product of the Respondent's antiunion activity.

Substantial evidence in the record as a whole supports these findings.[8]

The Company argues that, if a prima facie case of violation has been established, its showing of a legitimate business reason for the change in the early in-early out practice shifted the burden to the NLRB, citing *inter alia*, *NLRB v. Florida Steel Corp.*, 586 F.2d 436 (5th Cir. 1978); *NLRB v. Rich's of Plymouth, Inc.*, 578 F.2d 880 (1st Cir. 1978); *NLRB v. Patrick Plaza Dodge, Inc.*, 522 F.2d 804 (4th Cir. 1975); *Famet, Inc. v. NLRB*, 490 F.2d 293 (9th Cir. 1973); and *NLRB v. Freeman Co.*, 471 F.2d 708 (8th Cir. 1972). However, this argument overlooks that, while there may have been a legitimate business reason for Boyd to issue his directive, no such showing was made for Claibourn's enlarging the directive to change the early in-early out practice.[9] *See NLRB v. Okla-Inn*, 488 F.2d 498, 507 (10th Cir. 1973).

In view of the foregoing, we hold that substantial evidence in the record as a whole supports the NLRB's finding that the Company violated sections 8(a)(3) and (1) of the Act by changing the early in-early out practice involving the Company's six test technicians because of their union activities.

Enforcement ordered.[10]

---

8. Obviously Boyd's directive to have Workman spend 100 percent of *his* time supervising the technicians would not preclude the practice of permitting a technician to come in early and to work, unsupervised, during the early period.

9. The dissenting member of the NLRB panel was persuaded that antiunion motivation was "essentially factually precluded" by the fact that "both Burns and supervisors of the test technicians above the second-level supervisory position testified without contradiction that

they had not previously been aware that the test technicians enjoyed the early in-early out privilege." This overlooks the role of the first and second level supervisors, Claibourn and Workman, in enlarging Burns' directive.

10. We note that the NLRB's order includes reestablishment of the early in-early out practice and making Bates whole for lost time and wages because of the unlawful change in that practice.