**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LEPRINO CHEESE COMPANY, d/b/a Leprino Cheese Manufacturing Company, Respondent.**

No. 300–69.

United States Court of Appeals, Tenth Circuit.

March 31, 1970.

Rehearing Denied May 28, 1970.

William Wachter, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Ian D. Lanoff, Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner.

John A. Criswell, Englewood, Colo. (John Corbridge, Denver, Colo., on the brief), for respondent.

Before MURRAH, Chief Judge, and HILL and HICKEY, Circuit Judges.

HICKEY, Circuit Judge.

The National Labor Relations Board petitions this court to enforce orders based upon findings that respondent Leprino Cheese Manufacturing Company violated § 8(a) (1) of National Labor Relations Act, as amended,[1] by discharging employees Kenneth W. Gomez, Joe F. Salazar, Edward Abeyta, Roger Espinoza, Richard J. Macias and John Sanudo on December 25, 1966, for engaging in protected concerted activity under § 7 of the act. The board ordered the employer to cease and desist from the unfair labor practices found and from interfering in any other manner with the employees in the exercise of their § 7 rights.[2] Affirmatively, the board ordered the employer to offer reinstatement to the six employees, to make them whole for a loss of pay suffered as a result of the illegal discharges, and to post appropriate notices.

Two questions are presented for review: Whether the employees were engaging in protected concerted activity? Should the trial examiner have made available pre-hearing statements of non-appearing witnesses before the hearing?

Respondent was the employer of the employees identified above and is an employer within the meaning of § 2(2) of the act.

Cooperative milk marketers sell surplus milk to respondent which it receives whenever the product is available and in whatever quantity is surplus. The nature of the supply of surplus milk thus varies the quantity available for daily processing in the cheese factory and therefore dictates irregular working hours for the employees.

The unorganized employees are accustomed to working a six day week with the daily hours varying in accordance with the quantity of surplus milk to be processed. On occasions the employees are required to work on Sunday as the seventh day of the week and are paid time and one half for this overtime work.

In December of 1966 the named employees were concerned about possible employment on Sunday, December 25th, because of the nature of the holiday. They met at a nearby restaurant one day and discussed this concern and decided to write management for a policy statement regarding this particular holiday. The letter was not written nor was management advised of their concern at this time.

On December 24th at a coffee break the employees asked one of the supervisors about work on the following day. He advised them they would have to come in but that it appeared to be a short day and they would be through around noon.

The employees reported in and learned early in the day from a fellow employee that a large amount of surplus milk had been received and therefore a long day would ensue.

The identified employees sent one of their group to the plant manager to check whether a long day was probable and in the conversation that ensued the manager was requested to pay double time for work that day. The manager refused the double time and confirmed

---

1. 29 U.S.C. § 151 et seq. Section 158(a) (1) thereof provides: "(a) It shall be an unfair labor practice for an employer— (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;"

2. 29 U.S.C. § 157 reads as follows: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title."

that they would not be through by noon as anticipated the previous day.

The employees punched their time cards out and left the premises. While they were preparing to leave, they were admonished that they would be discharged if they left and would be blackballed and references would not be given to future employers.

There is some disparity in the testimony from which the facts are elicited, however, we start with the position that the findings of fact and drawing of inferences are for the board. N.L.R.B. v. Sequoyah Mills, Inc., 409 F.2d 606, 609 (10th Cir. 1969) and cases therein cited. A survey of the record indicates to us that the board's findings are supported by substantial evidence. Thus, we turn to respondent's contentions that the discharges were warranted.

■ Respondent employer contends this was not a strike but a partial strike and therefore not protected activity. First National Bank of Omaha v. N.L.R.B., 413 F.2d 921 (8th Cir. 1969) is cited for this proposition; however, in that case the court said:

"We recognize the difficulty of drawing a line between protected and unprotected activity in such situations. The task is even more difficult when the walkout occurs at or near the end of a regular day, and the employees return to work the next morning. The line is one which must nevertheless be drawn. Employees have the same right to engage in concerted activity to bring about a change in overtime policy as they do to bring about a change in wages or other working conditions. They have as much right to strike on this issue as any other, and they are not required to institute the strike at any particular time of the day or to maintain it for any particular period of time to be entitled to the protection of the Act. The test in each case is whether the employees have assumed the status of strikers. They cannot continue to work the reg-

ular hours of employment and refuse to work overtime." *Supra* at 925.

It is contended that the fact that the employees intended to return to work the following morning in fact distinguishes the incident in this case from a strike. While it is true during the attempted negotiations these unsophisticated, unorganized employees without advice from knowledgeable counsel admit they intended to return, nevertheless, before leaving they were told they were discharged, would be blackballed, and reference to another employer would be denied them. In the face of these threats some of the employees stayed while the men named in this action left.

We conclude that under the circumstances the activity was protected and that by leaving to protest working conditions, the men assumed the status of economic strikers. N.L.R.B. v. Sequoyah Mills, Inc., *supra*, relying upon N.L.R.B. v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962). *See also*, N.L.R.B. v. Western Meat Packers, Inc., 368 F.2d 65, 71 (10th Cir. 1966). Under these facts the intent to return to work the following day did not make the activity a partial strike.

Having affirmed the finding of the board that the activity was protected, there is little reason to discuss the § 8(a) (1) violation as being within the board's province and that it is sustained by substantial showing of evidence.

As the employer's evidence indicates, the process of converting milk to cheese when started must be promptly completed and cannot be delayed or turned off. The process had begun on the morning in question. The employer contends that the employees left its property in danger of damage because the processing had begun and because limited storage facilities necessitated processing at least a certain amount of the milk supply on that date, both of which the employees were aware.

■ The employer was able to call in family members who, with remaining

employees and management personnel, completed the process; however, delays caused a diminution in quality of the cheese and a loss in value resulted. This effect is relied upon as sufficient cause for discharge. Cases cited by the employer as indicating that a strike resulting in substantial property damage may be cause for discharge are not determinative here. Whether the rule has validity in certain circumstances, see N.L.R.B. v. Marshall Car Wheel and Foundry Co., 218 F.2d 409 (5th Cir. 1955) and N.L.R.B. v. Reynolds and Manley Lumber Co., 212 F.2d 155 (5th Cir. 1954), the spontaneity of the present walkout together with the lack of real danger to the employer's property negates its application in this case.

In any event a strike as an economic weapon usually results in loss to both the employer and the employees. The economic effect of a strike to aid employees in their bargaining is a necessary tool in the contemplation of the National Labor Relations Act, as amended. Thus, exercise of a right guaranteed by the act which results in such a loss to the employer is not cause for discharge.

■ After the complaint was filed in this case, the employer made a request to the General Counsel of the board pursuant to § 102.118, Regulations of the National Labor Relations Board, for examination of the pre-hearing statements of the employees concerned. This request was denied on the grounds that no good cause had been shown for their production. The employer's motion for production was denied by the trial examiner. Two of the six employees were not called to testify at the hearing by the General Counsel, and the employer argues that he should have been allowed to examine the statements of these two employees prior to the hearing.

Both parties agree that the validity of the board's rule has been upheld. Thus, the issue here is whether this case shows circumstances where the board and General Counsel were guilty of an abuse of discretion in their refusal to allow an examination of the statements in the General Counsel's possession by persons who were vitally interested in the hearing.

Section 102.118 of the board's rules and regulations is a codification of the Jencks rule and is found at 29 C.F.R. § 102.118(c).

"Since there is no specific provision in the National Labor Relations Act for discovery procedure, N.L.R.B. v. Globe Wireless, Ltd., 193 F.2d 748, 751 (9 Cir. 1951), it is the responsibility of the Board to formulate its own rules as to when discovery is available to a party, N.L.R.B. v. Vapor Blast Mfg. Co., 287 F.2d 402, 407 (7 Cir. 1961). * * * "Although it is within the sound discretion of the trial examiner to grant or deny a request for the taking of depositions, a reviewing court still determines whether that discretion has been abused in its exercise. Only when the examiner makes a ruling which is demonstrated to clearly prejudice the appealing party, will a reviewing court find an abuse of discretion. (citations omitted)." Electromec Design and Development Co., Inc. v. N.L.R.B., 409 F.2d 631, 635 (9th Cir. 1969).

The same reasoning applies to the board's rule in this case. The rule only provides that pre-hearing statements may be provided to the defense for cross-examination purposes after they have testified at the hearing. The two witnesses whose statements the employer seeks did not testify at the hearing and therefore the rule itself does not operate to make their statements available.

It does not appear to have been an abuse of discretion to deny to the company the statements.

The orders of the board will be enforced.