HOUSTON SHOPPING NEWS COMPANY, d/b/a Naylor Type and Mats, Petitioner-Cross Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.

No. 76–2630.

United States Court of Appeals, Fifth Circuit.

June 24, 1977.

Thomas W. Moore, Tom E. Smalley, Houston, Tex., for petitioner-cross respondent.

Elliott Moore, Deputy Assoc. Gen. Counsel, Michael Messitte, Atty., John Burgoyne, Supervisor, John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, Washington, D.C., for respondent-cross petitioner.

Louis V. Baldovin, Jr., Reg. Director, N.L.R.B., Region 23, Houston, Tex., for other interested parties.

Before GEWIN, AINSWORTH and SIMPSON, Circuit Judges.

GEWIN, Circuit Judge:

This case comes to us on the petition of Houston Shopping News Co., d/b/a Naylor Type and Mats (Naylor or the Company) to review and set aside an order of the National Labor Relations Board (the Board). By cross-application the Board seeks enforcement of its order, which was based on a decision that the Company had violated section 8(a)(5) and (1) of the National Labor Relations Act (the Act), 29 U.S.C. §§ 151 *et seq.*, 158(a)(5) and (1), by proposing to lease a portion of the Company's operation to its employees without first notifying their bargaining representative, Houston Typographical Union No. 87 (the Union). The Board's decision is reported at 223 NLRB 173, 1975–76 CCH NLRB ¶ 16,778. After thorough consideration of the record, the briefs and oral argument of counsel, it is our opinion that the order should be vacated and the Board's petition for enforcement denied.[1]

Naylor is a composition house engaged in the business of setting type and preparing other printing-related materials. Its operation is divided into three departments; the hot type or composing room, the cold type or photocomposition department, and the camera department. The employees in both the hot and cold type departments are represented by the Union, while the camera department employees are represented by a different bargaining representative. On February 19, 1975, a joint annual meeting of the Board of Directors and the stockholders[2] of the Company was held. To place this dispute in its proper context we refer to a portion of the minutes of that meeting:

1. In light of our decision in this case, we find it unnecessary to decide the other issues presented on appeal, and we further find it unnecessary to address the issue of mootness as raised by the parties by letter after oral argument.

In its brief the Company calls our attention to the fact that at the hearing before the Administrative Law Judge counsel for the General Counsel and the charging party made a judicial admission that the Union would not enjoy majority status unless the employees were ordered to be returned to their jobs. Their reinstatement was not ordered. Petitioner's Brief p. 14.

In its brief the Board asserts that the Board "has merely ordered the Company to bargain if in the future the Company again decides to institute a leasing arrangement. The Board has not directed a return to the *status quo* or provided for monetary relief." The Board's Brief at p. 14.

2. The five directors of the Company are Elizabeth Nalle, Elliot W. Jones, Wayne K. Hoppas, James B. Wesley, and W. W. Crider. The stockholders of the Company are the five above-named directors and Sharon Burns, the corporate secretary.

The Board of Directors discussed the serious financial plight of the company. Financial figures were made available to all those present. Miss Nalle stated, based on the financial information, that in order to reverse the losses the company is suffering, expenses would have to be reduced in the company's Hot Metal operation where the substantial amount of the revenue is being lost (62%). Mr. Wesley proposed the sale of that department to its employees. After a discussion it was decided to consider this and call a Stockholders meeting on February 25, 1975. At the February 25 meeting, the stockholders decided to offer to lease the hot type operation to the employees of that department for $1,000 per month. The employees were notified of this offer by hand-delivered letters on February 27, 1975.[3] The

Board found that making the offer directly to the employees constituted a violation:

> in dealing directly with its employees . . . by offering to lease a portion of its operation to them without prior notification to the Union . . . [the Company] totally ignored the Union's obvious interest in the proposed change in operations, and thus acted unlawfully and in flagrant derogation of its statutory duty to deal with its employees through their collective bargaining representative.

Clarence B. Turner was the Local 87 chapel chairman at the time, and he testified before the administrative law judge about the particulars of how the lease offer was made by the Company and the response of the Union.

Under questioning by counsel for the Board, Turner outlined the details relating

**3.** The letter delivered to the employees reads as follows:

> We have called you together today because we have a proposal to make to you.
>
> Since we feel a responsibility toward each of you and since we consider this composing room the best group of hot type experts in Houston, we want to give you an opportunity to go into business for yourselves with NO CAPITAL OUTLAY.
>
> We propose to lease you this composing room with all equipment in place at less than it costs Naylor and give you the chance to prove that there's money to be made in addition to your salaries.
>
> There is something over 5200 sq. ft. here and our proposal is to lease it to you at approximately 19¢—a flat $1000 per month. This would include your space, all utilities (except phone), free parking, janitorial service and all the equipment as it now stands. In addition to help you get started, we would offer it to you for the first thirty days FREE.
>
> You would form and name your own company, control your own delivery, billing and bookkeeping—be a separate company entirely.
>
> You would sell direct to customers. We are sure each of you has friends and you know printers and other profitable sources from which you could draw business. In addition, of course your prices would necessarily be competitive so Naylor would be a built-in customer and one of your largest sources of revenue. We have a few customers from whom we must insist that you do not solicit business:
>
> Shell, O & M, McCann, Prudential and Conoco (through Floyd Hoffman only)

> All things being equal this business will come to you anyway through Naylor so it would be better not to upset our present relationships. We have numerous other hot metal customers and you may feel free to solicit this business direct.
>
> We would leave all tools, repair parts, etc. right where they are for your use—when replacements become necessary you would make them yourselves. We would take inventory of metal and papers and give you our case lot breaks and allow you to pay this out easily at 10% per month after the first FREE 30 days mentioned.
>
> Since we have always had a full time machinist and kept the equipment in excellent condition, we ask that you do the same which is just good business on your part.
>
> We will be glad to furnish any credit information which we might have on your future customers and will assist you in any way we can to get off to a good start.
>
> You may at times wish to 'farm-out' to Naylor and if you care to offer—and accept—any courtesy trade discounts with us, we are sure we can come to a mutually fair arrangement.
>
> There are perhaps other questions which you would care to discuss but in the meantime we suggest you talk this over among yourselves and plan to meet with us noon Monday, March 3, to make some definite decision.
>
> We believe this to be a great opportunity for you and again assure you we will help in any way possible.

Record on Appeal, vol. III, Exhibit GC–2.

to the offer. During Thursday afternoon, February 27, the foreman requested Turner to arrange a meeting in the composing room of the nine employees involved because some of the company officials wished to talk with them. Actually Turner stated "they didn't really talk to us, but someone handed out a proposal." No one made a speech but a written proposal was handed to the employees. The employees read the proposal and someone remarked "Don't everybody speak at once." At that point, Miss Nalle, a company official, stated "You will want some time to think this over and reach a decision", and the meeting ended.

Turner testified that he immediately called the president of the local union and advised him of what had happened. On the next morning before going to work Turner delivered a copy of the proposal to union headquarters. Thereafter the proposal was freely and fully discussed by members of the Union and it was decided that a counterproposal would be made. The secretary of the Union "wrote out" a counterproposal which was given to all affected employees. They all decided that the counterproposal should be submitted to the Company. During the afternoon of Monday, March 3rd, five copies of the counterproposal were delivered to a company official. It was submitted as the employees' answer to the Company's proposal.

Later on March 3rd, representatives of Naylor and the Union met in a bargaining session for a new collective bargaining agreement to replace the previous one that had expired in August, 1974. At this meeting, the Company's attorney gave a copy of the lease offer and a copy of the counterproposal to W. T. Samuel, the Union President. According to Mr. Samuel, this was the first mention of the lease offer by the Company to the Union. Mr. Samuel went on to say that he thought the Company's attorney was kidding when the attorney asked him whether he knew of anyone who would lease the hot type department. This seems to be the end of any discussion of the lease offer. On March 4, 1975, the Company notified the Union and the hot type employees that effective March 5, 1975, the work force in that department would be reduced from nine to three.

The Union filed a charge with the NLRB on March 5, 1975 alleging that Naylor had violated sections 8(a)(5) and (1) of the Act by failing to notify the Union of its intent to lease the hot type department and further alleging that the March 5 lay-off was in violation of sections 8(a)(3) and (1) of the Act. The Administrative Law Judge found for the Company on both points, but his decision was modified by the Board. All three members of the Board agreed with the Administrative Law Judge's decision that the lay-off was motivated by economic considerations and was not in violation of the Act. But on the issue of failing to notify the Union of the lease offer, two members of the Board concluded, the Chairman dissenting, that the Company had engaged in an unfair labor practice. The Board ordered that the Company:

(1) Cease and desist from:

(a) failing to notify Houston Typographical Union No. 87, a/w International Typographical Union, AFL–CIO, of any intention to lease any portion of Respondent's operation to employees.

(b) In any like or related manner interfering with, restraining, or coercing employees in the exercise of their rights guaranteed them in Section 7 of the Act.

(2) Take the following affirmative action designed to effectuate the policies of the Act:

(a) Offer to bargain with the above-named labor organization about any plan to lease any portion of Respondent's operation to employees.

The Company was also ordered to post appropriate notices.

In reaching his decision the Administrative Law Judge placed great emphasis on the fact that the lease offer had been considered by the Union, a counterproposal made, and the Company's offer rejected by the hot type employees. The Board reasoned, however, that acceptance or rejection of the offer was not determinative of

the employer's duty to bargain and reversed the Administrative Law Judge's decision on this issue. The existence and even the breach of this duty, however, is not determinative of the issues before this court. Assuming *arguendo* that the Company did breach a duty to bargain with the Union on the lease offer, there is still to be answered the question of union acquiescence and actual participation in discussion of the proposal raised in Chairman Murphy's dissenting opinion:

> The majority correctly states the general principle that an employer has a duty to bargain with the employees' representative about a proposed change in terms and conditions of employment which would alter the employees' status. This principle, of course, like all general statements, is not applicable to all situations. In the instant case, my colleagues in the majority totally ignore an important factual aspect—that the Union had actual notice of [the Company's] proposal and not only failed to protest the unilateral action and direct dealing with the employees, but actually participated in preparing the employees' response to such unilateral and direct offer. In these circumstances, I would find that the Union acquiesced in [the Company's] action and is not entitled now to complain that [the Company] unlawfully refused to bargain. (footnote omitted).

We find it unnecessary to delve into the Company-Union relationship to decide this case, which, in our opinion, turns on the question of whether the Union acquiesced and actually participated in the Company's action. As indicated earlier for purposes of this discussion, we assume, without specifically finding, that the Company breached its duty to bargain with the hot type employees' bargaining representative.

In support of her dissenting position, Chairman Murphy relies on the Hartmann Luggage Company decision, 173 NLRB 1254, 1968–2 CCH NLRB ¶ 20,405. The facts in the *Hartmann Luggage* case closely parallel the facts in this case.[4] The similarities are further shown in the trial examiner's conclusions, which were adopted without modification by the Board:

> There was adequate notice given by the employer. Although there was no direct communication to a union official, the record established that the employee-members of the union's bargaining committee were advised of the proposed layoffs during the morning of January 18, and that the union's business agent was notified on the same day. This was adequate notice of the proposed layoff.
>
> Yet, despite discussions among employees concerning the layoffs and the holding of a union meeting on January 22, at which several matters were discussed, including layoffs, the union remained silent

**4.** We quote the following pertinent facts from the report of the Board's decision:

Employer, engaged in the manufacture and sale of luggage, is charged with having violated Section 8(a)(5) of the Act.

After certification of a union for the employer's production and maintenance employees, the parties began contract negotiations. An impasse on wages was reached on December 15, 1967, by which time, however, tentative agreement had been reached on virtually all of the non-economic terms, including tentative provisions for layoffs and management rights. These, however, were contingent upon the signing of a final contract.

Subsequently, on the morning of January 18, the employer told employees due to economic conditions, there would be a layoff of certain employees, effective on January 22. Two employee-members of the union's bargaining committee were present when the layoffs were announced. After hearing of the proposed layoffs, one of them notified the union's business agent. At no time prior to January 22 did the employer notify any union representative of the proposed layoffs, nor did the union protest or object in any way to the announcement of the layoffs.

On the night of January 22, employees decided to strike.

It was contended by the general counsel that the layoffs were effectuated unilaterally and in derogation of the employer's statutory duty to bargain with the union. The employer contended, on the other hand, that the layoffs were effectuated pursuant to a pre-impasse agreement that vested the employer with the right to effect layoffs under certain conditions and in accord with specified requirements.

*Hartmann Luggage Co.,* 173 NLRB 193, 1968–2 CCH NLRB ¶ 20,405 at 25,665.

insofar as the employer was concerned. Under these circumstances, the union failed to exercise diligently its right to demand discussion or bargaining and cannot now claim a failure to bargain on the part of the employer. Accordingly, no violation of Section 8(a)(5) of the Act can be found.

173 NLRB 1254, 1968–2 CCH NLRB ¶ 20,-405 at 25,665.

 In the present case, notice of the lease offer was made to the Union's chapel chairman and the other employees of the hot type department on February 27, 1975. The Union president was notified of the offer on the same day and was given a copy of the offer the next morning. Although no formal Union meeting was held to discuss the matter, informal discussions were held and the Union secretary prepared a counterproposal. In spite of the Union's knowledge of the lease offer and participation in the preparation of the counterproposal, however, just as in *Hartmann Luggage,* "the union remained silent insofar as the employer was concerned." *Id.* Furthermore, at the March 3 bargaining session when the Company's attorney asked the Union president whether he knew anyone who might want to lease the hot type department, Mr. Samuel, the president, testified that he considered the question "to be facetious and not serious." It was only after the March 4 announcement of layoffs in the hot type department that the Union raised the question of the Company's direct dealing with its employees. As noted above, the Board adopted the Administrative Law Judge's finding that the layoffs were motivated by economic considerations and were not in violation of sections 8(a)(3) and (1) of the Act.

In its brief, the Board's discussion of *Hartmann Luggage* is both cryptic and unpersuasive:

Cases such as *A–V Corporation,* 209 NLRB 451, 453–454 (1974), and *Hartmann Luggage Co.,* 173 NLRB 1254, 1255–1256 (1968), on which the Company relies, are inapposite. In these cases, the facts showed that the unions involved were given sufficient advance notice of the employer's intentions that meaningful bargaining could take place in the interim. As we have shown, the Union in this case had no notice until after the Company made its complete Offer to its employees.[5]

In *Hartmann Luggage* the layoffs were announced on *Thursday,* January 18, 1968 and were to be effective on *Monday,* January 22, 1968. In the instant case, the lease offer was made on *Thursday,* February 27, 1975 and an answer was requested by *Monday,* March 3, 1975. Thus, we are unable to follow the Board's argument that "sufficient advance notice" was given in the *Hartmann Luggage* case, while the notice in the present case was insufficient. Furthermore, while it is true that "the Union in this case had no notice until after the Company made its complete offer to its employees," it is equally true that the union representing the employees at the Hartmann Luggage plant had no notice until after the company made its announcement that layoffs were at hand. If any distinction is to be made between these two cases, we think it would run in favor of the Company.

Our view might be entirely different had the Union requested that this matter be included on the agenda of the already scheduled March 3 negotiating session. As noted above, the lease offer was brought up at the March 3 meeting, by the Company, but was dismissed by the Union president as a joke. Only passing mention was made that the Company's direct dealing with its employees may have been an unfair labor practice.[6] In general, except for the assist-

---

5. The Board's brief at pp. 12–13. The facts of A–V Corporation, 209 NLRB 451, 1974 CCH NLRB ¶ 26,298 are not so closely in point with the present case as are the facts of *Hartmann Luggage,* note 3, *supra.* Therefore we limit this discussion to the latter.

6. Present at the March 3 collective bargaining session was the International Representative of the International Typographical Union, who is reported to have "stated that he felt this was an unfair labor practice." Record on Appeal, vol. I, p. 63. This subject was not pursued, however.

ance in preparation of the counterproposal, the Union attitude toward the lease offer and the manner in which it was made seemed to be one of indifference.

 The purpose of the NLRA is to encourage collective bargaining, which by its very nature is a mutual undertaking. To this end, open lines of communication are necessary, and when these lines are cut, whether by oversight, misunderstanding, or intent,[7] it is up to the parties to first attempt to reopen them. Here the Union appeared to be satisfied with the procedure followed and freely participated in it. The alleged unfair labor practice claim here involved appears to be an afterthought, tacked onto the claim that the March 5 layoffs were illegal. Under the facts and in the circumstances disclosed by the record we refuse to enforce the bargaining order.[8] The order of the Board is vacated and enforcement is denied.

---

7. When asked why she did not call the Union about the lease offer before it was made, Naylor's president said:

It never dawned on me to call Mr. Samuel. We had leased things before. And to our way of thinking and certainly mine I've been there longer than the rest of them, it was the most logical thing in the world for our men to lease it, not some outsider. I didn't know there would ever be any problem with it at all until this whole thing came up, at which time I got a copy of the International bylaws and the constitution. And I still do not see anything prohibiting me from doing the same thing again.

Record on Appeal, vol. I, p. 105.

8. We realize that under the appropriate standard of review, the Board's order should be enforced if it rests upon substantial evidence considering the record as a whole. *NLRB v. Walton Mfg. Co.,* 369 U.S. 404, 408, 82 S.Ct. 853, 855, 7 L.Ed.2d 829, 831–32 (1962); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 487–91, 71 S.Ct. 456, 463–66, 95 L.Ed. 456, 467–69 (1951); *NLRB v. Brennan's, Inc.,* 5 Cir., 366 F.2d 560, 562, 565, *modified,* 368 F.2d 1004, 1005 (5th Cir. 1966). Such consideration, however, must in this instance include recognition of the Union's knowledge of the lease offer, assistance in preparation of the counterproposal, and failure to request bargaining. Our decision is based on the particular facts presented here, and nothing contained herein *should be construed as holding that a union which does not specifically request bargaining on every issue waives its claim as to such issue in all circumstances.*