NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

EMPIRE GAS, INC., Respondent.

No. 76–2060.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Sept. 28, 1977.

Decided Dec. 5, 1977.

James Y. Callear, N. L. R. B., Washington, D. C. (Jay E. Shanklin, N. L. R. B., Washington, D. C., on the brief), for petitioner.

John Edward Price, Del Norte, Colo., for respondent.

Before McWILLIAMS, BARRETT and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge:

This is a labor relations case in which the NLRB seeks enforcement of an order which had issued on June 10, 1976. The fundamental issue in the case is whether the activities of one Cooper, an employee, in advocating a partial cessation of work were protected under § 7 of the Act, 29 U.S.C. § 157 (1970). Cooper wrote and sent a letter to his fellow employees which urged them to refrain from pumping gas on a particular day. It also urged that if this did not bring about a change, not to pump gas on two days.[1] The activities which

---

1. This letter was as follows:

Dear Friend,

It is imperative that we, the men who drive the trucks and deliver the fuel for the Empire Gas Company, get our act together in the immediate future and put a stop to Mr. Robert Plaster's "Bonus Growth Program" insofar as this program delineates [sic] the tenth of a cent per gallon commission paid to the company drivers. We cannot accept this unilateral cut of our income nor our unsolicited enrollment in a bogus program handed to us in August intead [sic] of the real income of salary raises. Simple mathematics show that the drivers of Empire Gas take a cut in last year's take home pay. A plant with a 500,000 gallonage last year paid $500 in commission to its drivers. If this same plant pumps a half million gallons again this year there will be no commission paid to its drivers. Given an optimistic growth factor of ten percent this plant will pump 550,000 gallons this new year, and the commission paid the driver (three man plant).will be $333 commission under the "Bogus [sic] Growth Program". The standard 1/10 of a cent commission would be $550—an income loss of better than $200. What is your situation? Are you expecting 10% growth, 5% growth, or marginal growth? In these troubled economic times, Robert Plaster cums [sic] with a growth program that promises to take all of last year's commission away from you until it grows, and the more it grows, the more of last year's income will be returned to you.

All of us drivers are in this together, and it is only by collective action that we can right the wrong. We must demand that our wages not be so capriciously dealt with, and that the unilateral severance of commissions paid to the men who drive the trucks and deliver the fuel for this company be reinstated as per se the company policy manual. Unless there is recognition of our problem by the home offices in Lebanon by the end of this month (September), pump no gas on the first of October. This will demonstrate solidarity and commitment to our just cause. If no change is forthcoming, no gas will be

were solicited in the letter quoted below did not come about because the company fired Cooper very soon after the letter was written.

Gregory T. Cooper was a driver-salesman for Empire Gas, Inc., Nederland, Colorado operation, from February 1975 until his discharge September 18, 1975. His compensation consisted of a monthly salary of $550 plus .1 of a cent per gallon delivered by him. This basis of compensation was unilaterally modified by Empire on August 15, at which time it announced that it had a new bonus program to replace the .1 of a cent per gallon commission. It was then that Cooper prepared the above-quoted letter. He mailed it on September 13 to 112 of Empire's drivers in different parts of the country. In it he advocated collective action to protest the new bonus program. The particular proposed action was refusal of the drivers to pump gas on October 1 and if the demanded change was not made, to refuse to pump gas on October 17 and 18. The letter expressed opposition to the proposed bonus program and the taking of the suggested action to manifest the protest.

The Division Manager, one Cliff Goodwin, came to Nederland on September 18, 1975, and discharged Cooper. He did not, however, assign the letter writing as the reason. He instead stated as his reason that Cooper had driven a company truck home and had been 15 minutes late to work that morning.

There was evidence in the record that the company took a dim view of Cooper's letter. On September 15, the local manager, Johnson, called Cooper into his office and asked him if he knew anything about the letter sent out to the drivers. Cooper admitted that he was the author. Johnson said that

the home office was upset about it and that manager Goodwin would be coming to fire him. The very next day the company hired a new driver-salesman.

On September 17, the day before Goodwin came to Nederland, there was a conversation between Johnson and the former manager, MacDougall, in which Johnson stated to MacDougall that Goodwin "was coming up to let him (Cooper) go over letters he had written to drivers."

The evidence showed also that Cooper had customarily driven home a company truck throughout the period of his employment if he was closer to home than to the Nederland office at the end of the day. He had not been criticized by the managers for doing this. Goodwin saw the letter on the 18th when he fired Cooper, but he maintained that the letter was not the reason for the discharge. However, the Board found that the letter was the cause of the firing, and Empire does not contest this finding.

The Board found that the activity of Cooper was protected by § 7 of the Act and that the company had violated § 8(a)(1) of the Act by threatening Cooper with discharge and thereafter discharging him since he was engaged in concerted activity which was protected by § 7 of the Act. The Board ordered the company to cease and desist from the unfair labor practices found and also to cease and desist from infringing upon the rights guaranteed to employees by § 7 of the Act. The company was also ordered to offer Cooper immediate and full reinstatement to his former position, to make him whole for any loss of earnings and other benefits because of his unlawful discharge, and to post the usual notices.

pumped on the 17th and 18th of October. I am only going to reach some one third of the Empire Gas plants, please carry this program on for the good of all of us driving for this company, and write or communicate with at least three or four other plants in your area. In the last three months five managers have left the company in Northern Colorado, but their actions lost much of their effect because the men did not act collectively. The success of our venture will be directly proportional to the unanimity with which we act. All of us should also write to Lebanon attention to Mr. Plaster. I would also like to hear from you yourself and will keep an account of our strength of our new coalition.

Most respectfully yours,
Gregory T. Cooper [signed]
Gregory T. Cooper
P. O. Box 111
Rollinsville, Colorado 80474

## I.

### WHETHER THE LETTER WAS WITHIN THE PROTECTION OF THE ACT AND, PARTICULARLY, WHETHER IT FELL WITHIN THE PART OF THE ACT WHICH PROTECTS AGAINST EMPLOYER INTERFERENCE OR DISCIPLINARY ACTION "OTHER CONCERTED ACTIVITY FOR THE PURPOSE OF COLLECTIVE BARGAINING OR OTHER MUTUAL AID OR PROTECTION."

Section 7, *supra*, provides that "employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." The section also provides that employees "have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title."

Section 8(a)(1), 29 U.S.C. § 158(a)(1), declares that it is an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in § 7 of the Act, 29 U.S.C. § 157.

What are "other concerted activities for the purpose of collective bargaining or other mutual aid or protection"? The Third Circuit in *Mushroom Transportation Co. v. NLRB*, 330 F.2d 683, 685 (3d Cir. 1964), has defined such activities in broad terms, saying in that opinion that a conversation may constitute a concerted activity, although it involves only a speaker and a listener provided that it appears that the conversation had the object of initiating or inducing or preparing for group action or that it had some relation to group action in the interest of the employees. The court also said that fruition was not necessary because such a requirement would severely limit the right, but that mere talk was not activity; that it had to be talk looking to group action. The

Third Circuit in the cited case found that the employee's practice of talking did not constitute concerted activity; that this constituted mere griping or complaining.

In a later case, that of *Hugh H. Wilson Corp. v. NLRB*, 414 F.2d 1345 (3d Cir. 1969), *cert. denied*, 397 U.S. 935, 90 S.Ct. 943, 25 L.Ed.2d 115 (1970), the Third Circuit held that complaints by two employees as to the company's failure to contribute to their profit sharing plan did constitute concerted activity. The activities of these two employees reflected general dissatisfaction and had some relation to group action. *Id.* at 1355. *Accord, Carbet Corp.*, 191 NLRB No. 145 (1971), *enforced*, 68 Lab.Cas. ¶ 12,845 (6th Cir. 1972).

The result was different in *NLRB v. Northern Metal Co.*, 440 F.2d 881 (3d Cir. 1971), where the employee was probationary and not a member of the union. It was there held that this was not talk looking toward group action within the *Mushroom* doctrine because the activity in question was individual seeking a special benefit.

Individual action soliciting group activity has been held to be concerted in other cases. *See Owens-Corning Fiberglas Corp. v. NLRB*, 407 F.2d 1357, 1365 (4th Cir. 1969). Other circuits have endorsed this viewpoint. *Dreis & Krump Manufacturing Co. v. NLRB*, 544 F.2d 320, 327–28 (7th Cir. 1976); *Randolph Division, Ethan Allen, Inc. v. NLRB*, 513 F.2d 706, 708 (1st Cir. 1975).

In our case the evidence shows an effort to solicit group support of a collective refusal to work on certain days. The Board's reason for holding this to be within the protection of § 7 was that collective activities would surely be hampered if such individual efforts looking to group action were not protected.

■ Furthermore, no loss of § 7 protection resulted because of the failure of the employee to present his grievance to the employer prior to attempting to organize a work stoppage. The Supreme Court has considered and has rejected such an argument in *NLRB v. Washington Aluminum*

*Co.*, 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962).[2]

## II.

### IS THE PROTECTION LOST IF THE WORK STOPPAGE (HAD IT BEEN CARRIED OUT) WOULD HAVE BEEN UNLAWFUL?

Respondent argues that it is lost on this account. The case of *UAW Local 232 v. Wisconsin Employment Relations Board*, 336 U.S. 245, 69 S.Ct. 516, 93 L.Ed. 651 (1949), applying Wisconsin law, so ruled. However, this so-called *Briggs-Stratton* case was overruled by the Supreme Court in *Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Commission*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). In *Lodge 76* the union and its members refused to work overtime. The NLRB Regional Office dismissed a charge filed by the employer claiming a violation of the NLRA on the ground that refusal to work overtime was not a violation of the Act. A complaint was then filed before the state commission. That body found a violation of a state statute, which finding was affirmed by the Wisconsin courts. The United States Supreme Court reversed, holding that states may not regulate partial strike activity. The Court further said that even if the refusal to work overtime was not protected under § 7, which issue the Court refused to decide, it might be "an activity that Congress intended to be 'unrestricted by *any* governmental power to regulate' because it was among the permissible 'economic weapons held in reserve . . . actual exercise [of which] on occasion by the parties, is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized.'" Citing *NLRB v. Insurance Agents*, 361 U.S. 477, at 488–489, 80 S.Ct. 419, at 426, 4 L.Ed.2d 454. The reason assigned for rejecting the state statute was that to have followed it would have frustrated the federal Act's processes. In overruling the *Briggs-Stratton* case the Court held that states may not regulate partial strike activity.

■ There can be no question from the decision in *Lodge 76* that state law can have no bearing on our problem; that the issue is governed by federal law. Our conclusion is that the letter which is before us is within the protection of § 7 irrespective of whether the proposed act would be protected. This is not, however, entirely free from doubt. The Supreme Court has not ruled on the issue whether *solicitation* of activities which, if acted out, would be illegal is nonetheless protected under the mentioned clause of § 7. For that reason we consider whether the activity, if it were carried out, would be within the protection of the Act.

The case of *NLRB v. Insurance Agents' International Union*, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960) took up the slowdown activities which it assumed were unprotected under § 7, and held that they were not unfair labor practices under § 8(b)(3). It was held in that case that the Board did not have the power to choose the economic weapons to be used by labor or by management. The Court pointed out in *Insurance Agents* that Congress had been specific with respect to outlawing particular economic weapons on the part of unions and that it had not clearly ruled out the slowdown activities that were found in the *Insurance Agents* case.

■ Plainly, the activity of Cooper here was not specifically prohibited by § 8 of the Act. Whether, however, they are protected under § 7 is not thereby decided.

## III.

■ As noted, the Supreme Court did not in *Lodge 76* determine whether partial strike activities are within the protection of § 7 of the Act. The Court did notice the problem in its footnote number 14, 427 U.S. at 152, 96 S.Ct. 2548. It is there suggested that it is within the discretion of the Board to hold on a case to case basis that such activity is protected or is not protected. It was there said:

---

2. This issue was not raised by the parties. It first came to light in the dissenting opinion.

It may be that case-by-case adjudication by the federal Board will ultimately result in the conclusion that some partial strike activities such as the concerted ban on overtime in the instant case, when unaccompanied by other aspects of conduct such as those present in *Insurance Agents* or those in *Briggs-Stratton* (overtones of threats and violence . . . and a refusal to specify bargaining demands . . .) are "protected" activities within the meaning of § 7 . . . . 427 U.S. at 152 n. 14, 96 S.Ct. at 2559. The dissenting Justices in the *Briggs-Stratton* case (which was overruled by *Lodge 76*) were of the opinion that intermittent strike activity was protected by § 7. *See* 336 U.S. at 265, 69 S.Ct. 516 (Douglas, J., dissenting); *id.* at 268, 69 S.Ct. 516 (Murphy, J., dissenting).

Footnote 14, discussed and quoted above, mentioned that *Insurance Agents, supra,* assumed *arguendo* that the slowdown there was unprotected, but stated that the assumption was based on the similarity of the activities in *Insurance Agents* to the sit-down strike which was held unprotected in *NLRB v. Fansteel Metallurgical Corp.*, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (1939), in which there was substantial violence. In the context of partial strikes, violence may well be the dividing line between protected and non-protected activity. The peaceful tactics proposed by Cooper are more similar to the concerted refusal to work overtime in *Lodge 76*.

It is said that all concerted activities are protected unless unlawful, violent, in breach of contract, or indefensible. *See NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 17, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962). As we have said above, the work stoppages proposed by Cooper would not have been illegal nor is there any evidence that they would have been violent or in breach of contract. As to whether they were indefensible, it was said in *NLRB v. Local 1229, IBEW*, 346 U.S. 464, 477, 74 S.Ct. 172, 98 L.Ed. 195 (1953), that indefensible tactics involved tactics of disloyalty which were compared to physical sabotage.

If, then, it amounts only to partial work stoppage such as is here present, it follows that the activity here is protected.

It is also to be noted that there are differences in degree among partial work stoppages. Some pose more serious threats than others. Thus the slowdown in *Insurance Agents* would be one of the more far-reaching and serious kinds. The proposal in our case was much more limited.

We have held that a one-day work stoppage is a protected activity in *NLRB v. Leprino Cheese Co.*, 424 F.2d 184 (10th Cir.), *cert. denied*, 400 U.S. 915, 91 S.Ct. 173, 27 L.Ed.2d 154 (1970). There are other similar cases. *See NLRB v. A. Lasaponara & Sons, Inc.*, 541 F.2d 992, 997–98 (2d Cir. 1976), *cert. denied*, 430 U.S. 914, 97 S.Ct. 1325, 51 L.Ed.2d 592 (1977); *Florida Steel Corp.*, 221 NLRB No. 112 (1975), *enforced*, 82 Lab.Cas. ¶ 10,147 (4th Cir. July 25, 1977). The only difference between the one-day stoppage which has been approved in the above cases and that at bar is that here there was a proposed two-day stoppage to follow a failure of the one-day stoppage. This, however, does not form any basis for distinguishing the two situations.

The case of *NLRB v. Robertson Industries*, 79 Lab.Cas. ¶ 11,688 (9th Cir. 1976), is very similar on its facts to the present case in that it involved two one-day work stoppages in three months. The court there said that this did not give rise to a repeated pattern of half-strikes.

Also noteworthy is the fact that the present case is not an effort to have a work stoppage and also to receive pay for days of no work.

In addition, the Board has urged that these activities be held to be protected. This is persuasive since it is an area in which courts defer to the expertise of the Board. *See NLRB v. Circle Bindery, Inc.*, 536 F.2d 447, 452–53 (1st Cir. 1976); *cf. Hudgens v. NLRB*, 424 U.S. 507, 521, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976). We conclude that the proposed activity would have been, had it been carried out, within the protection of § 7 of the Act.

In sum, Cooper was fired because he sent out letters attempting to organize fellow employees, a protected concerted activity whether considered alone or in conjunction with the proposed acts. It follows, then, that his discharge based on the writing of the letter violated § 8(a)(1) of the Act.

The order of the Board is enforced.

BARRETT, Circuit Judge, concurring in part and dissenting in part:

I concur in that part of the majority opinion which holds that the *mailing* by Cooper of his letters to fellow drivers did come within the protection of § 7 of the Act because it did call for collective activities of all of Empire's drivers at some 112 plants. I dissent from that part of the opinion which holds that under the circumstances of this case Cooper's attempts to organize *unannounced* work stoppages without first submitting his grievance to Empire about the proposed new Bonus Growth Plan did not deprive him of § 7 protection in terms of the affirmative relief ordered by the Board, i. e., reinstatement of Cooper to his former position or one equivalent thereto with restoration of all seniority and other rights and all back pay because of his "unlawful discharge." [R., Vol. III, p. 87].

Some facts which I consider important have not been related in the majority opinion. When the proposed "Bonus Growth Plan" objected to by Cooper in his letter was first discussed with him on August 15, 1975, by Empire's Division Manager Goodwin and local Manager Johnson, Cooper *did not* voice any objection thereto, although he did threaten to quit work the next day if he did not receive a $50.00 per month raise which he stated had been promised him. The next day Cooper was told the raise was approved. About a week later, Empire's president submitted a memorandum explaining in detail the new "Bonus Growth Plan." Instead of complaining to any of the Empire officials about the plan, Cooper proceeded to prepare and submit the subject letter. The majority states that the unannounced work stoppages (insofar as Cooper is concerned) "did not come about

because the company fired Cooper very soon after the letter was written." Nothing in the record supports this conclusion. The record shows that only *two* of Empire's drivers responded to Cooper's letter. One of them favored the new plan while the other generally agreed with Cooper. [R., Vol. II, pp. 70–72.] Before the administrative law judge and the Board, Empire *has not* contested the proposition that the *mailing* of Cooper's letter was a protected activity. The entire thrust of Empire's challenge has been anchored to the proposition that its refusal to reinstate Cooper is lawfully justified because the action recommended by Cooper in his letters was an unprotected, unlawful activity just as that found in *International Union, U.A.W.A., A.F. of L. Local 232, v. Wisconsin Relations Board*, 336 U.S. 245, 69 S.Ct. 516, 93.L.Ed. 651 (1949) in that the *unannounced* "pump no gas" solicitations constituted *work stoppages* without the true existence of a labor dispute simply because no grievance has ever been made to Empire by Cooper or any other Company driver.

The Board, for some unexplained reason, elected to reach only part of the "concerted activity" issue in its findings and conclusions in the case at bar, i. e., that Cooper's mailing of the letters constitutes a protected "concerted activity" within § 7 of the Act. Empire does not challenge this finding. The Board did not, however, render any findings or conclusions relating to the issue whether Cooper is entitled to affirmative relief based upon Respondent's contention—premised on *International Union, et al. v. Wisconsin Employment Relations Board, et al., supra*—that the substance of the letter was Cooper's inducement and encouragement of fellow employees to engage in an unprotected activity, i. e., unannounced work stoppages. Even so, the Board has, in its Brief on Appeal, strongly challenged Empire's contention relating to the work stoppages issue, although neither the administrative law judge nor the Board reached the issue in findings or conclusions.

I.

I concur that the intent of Cooper's letter—reduced to its intended effect—is the

fact that Cooper was communicating with his fellow drivers in the hope of initiating or inducing group action for the benefit of all of Empire's drivers. This was not, then, a case where Cooper's sole aim or intent was that of furthering his individual status. If it had been so, it would not constitute protected "concerted activity." *See N.L. R.B. v. Meinholdt Manufacturing, Inc.,* 451 F.2d 737 (10th Cir. 1971).

It is of no legal consequence that even though the administrative law judge's decision was rendered on March 16, 1976, and the Board's Order on June 10, 1976—a period of two and one-half years after Cooper mailed his letters to fellow employees—that none of Cooper's fellow employees elected to pursue Cooper's proposed course of action for their "mutual aid and benefit."

For a more detailed analysis of the rule that "concerted activity" under the Act is met if the purpose is to induce or to prepare for group action to accomplish better working conditions or terms of employment and to correct a grievance or complaint whereby the employees act together for their "mutual aid or protection," *see*: 22 A.L.R. Fed. 113, 120 § 3; 48 Am.Jur.2d, Labor and Labor Relations, § 616; 19 A.L.R.2d 566.

## II.

I dissent from that part of the majority opinion which holds that Cooper is entitled to the affirmative relief ordered by the Board.

In *NLRB v. Washington Aluminum Company,* 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1972), the Court enforced a Board order reinstating with back pay some seven employees who had walked off of their jobs at the plant without permission because of the cold working conditions. The Court of Appeals had refused to enforce the Board's order because the workers—who were unorganized just as are the employees of Empire in this case—had left their employment, *without affording the company an opportunity to avoid the work stoppage by granting a concession to a demand* (to provide heat). However, the Supreme Court significantly pointed out that on a number of

*prior* occasions *each* of the seven employees had individually complained to company officials about the coldness in the machine shop during the winter, without any relief. The work stoppage occurred *only* after the various efforts by the employees to remedy the specific working condition had failed. It was on this predicate that the Supreme Court held the action of the employees to be a protected activity involving a labor dispute.

Empire has relied exclusively on *International Union of Automobile Workers, Local 232 v. Wisconsin Employment Relations Board,* 336 U.S. 245, 69 S.Ct. 516, 93 L.Ed. 651 (1949) in resisting the Board's order requiring reinstatement of Cooper at back pay without deprivation of his seniority or other privileges and to render him whole by reason of his loss of any other benefits resulting from his alleged wrongful discharge. Empire contends that Cooper's "secretive plan" in soliciting his fellow employees not to "pump gas" on three specified dates if the demands contained in his September 13 letter were not acceded to constituted tactics classified as "unprotected activity" in that they encouraged *unannounced work stoppages.* In *International Union-Wisconsin, supra,* the work stoppages were condemned under a Wisconsin statute which declared unfair "any concerted effort to interfere with production except by leaving the premises in an orderly manner *for the purpose of going on strike."* [Emphasis supplied.] The facts of that case reflect that the stratagem, i. e., work stoppages, was agreed upon by the Union leaders and the Union membership. There was no provision in the NLRA then—just as there is none today—which speaks expressly to the subject of "work stoppages." Under these circumstances, the Supreme Court held that the Wisconsin act applied. The discharge of the seven employees by the employer for violation of the Wisconsin statute was upheld. The pre-emption doctrine articulated in *International Union-Wisconsin, supra,* has since been overruled by the Supreme Court in *Lodge 76, Int. Ass'n of Machinists & Aerospace Workers v. Wisconsin Employ-*

ment *Relations Commission*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). Even so, the Supreme Court did not then nor has it since suggested that (a) unannounced work stoppages are lawful under all circumstances or that (b) state law is not to be in anywise considered or that, as the majority states, "state law can have no bearing" on our problem.

Our cursory examination of the Colorado statutes—of which we take judicial notice—was undertaken for guidance in terms of that state's policy. Colorado has a statute the equivalent of § 7, 29 U.S.C. § 157. It guarantees employees the right to engage in lawful concerted activities for the purpose of collective bargaining or other mutual aid or protection. C.R.S. (1973) § 8–3–106. Another Colorado statute provides that before any employees exercise the right to strike in any industries or occupations other than those dealing with agriculture, they must first give notice to the state division of labor in the department of labor and employment 20 days in advance thereof; and the division is then directed to immediately notify the employer and to take steps to effect mediation; and, if the mediation fails, the director is to endeavor to induce the parties to arbitrate the controversy. Any strike called during the 20-day period aforesaid is declared an unfair labor practice. C.R.S. (1973) § 8–3–113(2). And C.R.S. (1973) § 8–3–104(c) provides that "No controversy between an employer and his employee shall constitute a labor dispute until after a bargaining unit in accordance with [this article] is created and a dispute arises between the bargaining unit [one created by vote of non-union employees at a plant or industry, etc.] and the employer." Colorado's statutory provisions above referred to do correlate with the Wisconsin statute applied in *International Union-Wisconsin, supra.* They are deserving of careful consideration.

The duty to bargain in good faith is basic to the purposes of the NLRA and the Colorado statutes cited, *supra.* In *H. K. Porter Co., Inc. v. NLRB*, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970), the Supreme Court set forth the primary objective of the NLRA:

The object of the Act was . . . to ensure that employers and their employees could work together to establish mutually satisfactory conditions. *The basic theme of the Act was that through collective bargaining the passions . . . and struggles of prior years would be channeled into constructive, open discussions leading, it was hoped, to mutual agreement.* (Emphasis supplied.)

397 U.S., at p. 103, 90 S.Ct., at 823.

Thus, while an employer's predetermined and inflexible position toward merit increases for employees submitted with intent to reach a bargaining impasse is in bad faith [and, accordingly, an unfair labor practice], the mere tendering by an employer of a proposal [such as the "Bonus Growth Plan" in the instant case] or counterproposal which may be "predictably unacceptable" is not, standing alone, sufficient to justify a finding of bad faith if the proposal does not foreclose future discussions or negotiations. *NLRB v. Fitzgerald Mills*, 313 F.2d 260 (2nd Cir. 1963), *cert. denied*, 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64 (1963). Nothing in this record evidences that Empire foreclosed discussions or negotiations with Cooper and his fellow employee drivers when the "Bonus Growth Plan" was proposed. In fact, the opposite conclusion is indicated. A violation of the Act could have occurred had Empire submitted the "Bonus Growth Plan" with intent to refuse to discuss the terms and conditions thereof with its employees or to negotiate relative thereto. *Kroger v. N.L.R.B.*, 399 F.2d 455 (6th Cir. 1968); *N.L.R.B. v. Union Mfg. Co.*, 179 F.2d 511 (5th Cir. 1950).

I observe that the Board's justification [Brief of Board, pp. 10, 11.] of Cooper's case for the work stoppages (which the Board elects to refer to as "the strikes") was (a) conditioned on the Company's response, (b) dependent on the response of the other drivers, and (c) protected, *in any event*, under Section 13 of the Act which provides that *the right to strike* shall not be diminished, impeded or interfered with. From

this juncture, the Board proceeds [Brief of Board, pp. 11, 12.] to cite decisions which it contends support its position that Cooper's call for unannounced work stoppages did not fall into the category of "intermittent" or "recurrent" work stoppages constituting partial strikes in violation of the Act. The Board failed to point out that in the cases it relies upon the "walkouts" or "work stoppages" were not undertaken until *after* the concerned employees had expressed their grievances about a work condition without having received any remedy or favorable response from the employer. In each instance a "labor dispute" did in fact exist and the grievance had been voiced. *Walkouts by employees who have previously voiced their grievances about a condition of employment constituting a "labor dispute" within the meaning of the Act have been held to be protected concerted activities. N.L.R.B. v. Washington Aluminum Co.*, 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962); *N.L.R.B. v. Okla-Inn*, 488 F.2d 498 (10th Cir. 1973); *N.L.R.B. v. Tonkawa Refining Company*, 452 F.2d 900 (10th Cir. 1971); *N.L.R.B. v. Leprino Cheese Co.*, 424 F.2d 184 (10th Cir. 1970), cert. denied, 400 U.S. 915, 91 S.Ct. 173, 27 L.Ed.2d 154 (1970); *N.L.R.B. v. Serv-Air, Inc.*, 401 F.2d 363 (10th Cir. 1968); *United Merchants & Mfr., Inc. v. N.L.R.B.*, 554 F.2d 1276 (4th Cir. 1977); *N.L.R.B. v. A. Lasaponara & Sons, Inc.*, 541 F.2d 992 (2nd Cir. 1976); *N.L.R.B. v. Elias Brothers Restaurants, Inc.*, 496 F.2d 1165 (6th Cir. 1974); *Shelly & Anderson Furniture Manufacturing Co., Inc. v. N.L.R.B.*, 497 F.2d 1200 (9th Cir. 1974); *N.L.R.B. v. Buddies Supermarkets, Inc.*, 481 F.2d 714 (5th Cir. 1973); *Food Fair Stores, Inc. v. N.L.R.B.*, 491 F.2d 388 (3rd Cir. 1974) (where the discharged employees made every reasonable effort to express their work dispute grievance with company officials without success prior to an 18-hour walkout but the walkout was held to be an unprotected activity because carried out against the wishes of the Union). I reiterate that in each of the above-cited decisions the discharged employees had, *in each and every instance*, first presented their grievances relative to terms of employment with their employer *before* undertaking the walkouts.

There was nothing secretive about their positions relative to the matters in dispute. To the same effect is this Court's holding in *N.L.R.B. v. Sequoyah Mills, Inc.*, 409 F.2d 606 (10th Cir. 1969). There 12 of 19 unorganized "over-the-road drivers" met and discussed terms of their employment. Four of that group were selected to discuss their grievances with Company's vice-president. He was not available, but they did voice their grievances to the assistant director of personnel who offered to see if he could arrange a meeting of the group with the vice-president. Such a meeting was never arranged by the company. Soon thereafter the company discharged four of the drivers. We there held that:

It is well settled that even though union activities are not specifically involved, *the presentment of grievances by a group of employees to their employer constitutes a [protected] concerted activity* . . . (Emphasis supplied.)

409 F.2d, at p. 608.

In *N.L.R.B. v. Tonkawa Refining Company, supra*, this Court drew the line between a protected § 7 work stoppage (strike) by employees undertaken for the purpose of protesting wages and working conditions as distinguished from work stoppages which are partial, intermittent or recurrent. Our *Tonkawa* opinion is anchored to this language from *Houston Shopping News Co. v. N.L.R.B.*, 554 F.2d 739 (5th Cir. 1977):

The purpose of the NLRA is to encourage collective bargaining, which by its very nature is a mutual undertaking. To this end, open lines of communication are necessary, and when these lines are cut, whether by oversight, misunderstanding, or intent, it is up to the parties to first attempt to reopen them.

554 F.2d, at p. 745.

In an analogous sense, this Court stated in *N.L.R.B. v. Okla-Inn, supra* :

It is the Board's responsibility to strike a balance between the exigencies of business and the invasion of employee rights in the light of the Act and its policies

. . .

488 F.2d, at p. 505.

In accord with *Tonkawa, supra,* is *N.L. R.B. v. Blades Manufacturing Corp.,* 344 F.2d 998 (8th Cir. 1965). There, the Board found that each of three walkouts was a separate, spontaneous, protected activity. The Court reversed, holding that such finding was contrary to both the law and substantial evidence on the record in its entirety. The Court held that the Company's discharge of 31 employees following several warnings from the employer that they cease that which the Court held to be unprotected concerted activities in the form of deliberate "slowdown" or "walkouts" of short duration rather than a *total strike* did not constitute an unfair labor practice on the part of the employer violative of § 8(a)(1) and (3) of the Act, as amended, 29 U.S.C. § 158(a)(1) and (3). In *N.L.R.B. v. Blades, supra,* the Court further and significantly noted:

And in *NLRB v. Insurance Agents,* 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960), the Supreme Court, on the basis of its Briggs-Stratton rationale . . . agreed . . . that a *total strike* is a concerted activity protected from employer interference by §§ 7 and 8(a)(1). But deliberate "slowdowns" and "walkouts" by employees [constitute] unprotected concerted activities and the employer was free to discharge [them] for their unlawful, disloyal tactics. More recently, Mr. Justice Stewart observed in another context in *American Shipbuilding Co. v. NLRB,* 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965):

There is nothing in the statute which would imply that the right to strike 'carries with it' the right exclusively to determine the timing and duration of all work stoppages. The right to strike as commonly understood is the right to cease work—nothing more.

344 F.2d, at p. 1005.

Analogous to the holding in *N.L.R.B. v. Insurance Agents, supra,* the Supreme Court in *American Shipbuilding Co. v. N.L. R.B., supra,* held that an employer does not commit an unfair labor practice under ei-ther § 8(a)(1) or (3) of the Act when, *after an impasse in negotiations,* he shuts down his plant and lays off his employees for the sole purpose of applying economic pressure in support of his legitimate bargaining position. Of significance here, the Court made this observation relative to pre-strike "walkout" or "work stoppage" acts:

Thus, 29 U.S.C. § 158(d)(4) . . . prohibits the use of a strike or lockout unless requisite notice procedures have been complied with; 29 U.S.C. § 173(c) . . . directs the Federal Mediation and Conciliation Service *to seek voluntary resolution of labor disputes without resort to strikes or lockouts* . . . (Emphasis supplied.)

380 U.S., at p. 315, 85 S.Ct., at p. 965.

Notwithstanding the fact that neither the administrative law judge nor the Board reached the true issue posited by Empire, i. e., that while the *mailing* of the letters by Cooper is a protected concerted activity, still the *means* urged deprived Cooper of any affirmative relief, the majority opinion decides the issue for the first time on review adverse to Empire. I cannot concur therewith.

The issue of reinstatement of Cooper with restoration of his seniority and full back pay—the affirmative relief ordered by the Board—must be judged in relation to the issue whether Cooper's recommended unannounced work stoppages if the Company had not withdrawn the Bonus Growth Plan prior to three specific dates constituted an unfair labor practice on his part. It is fundamental that if an employee is guilty of misconduct warranting his discharge, the employer is under no duty to reinstate him. *N.L.R.B. v. Fansteed Metallurgical Corp.,* 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (1939).

The touchstone of the NLRA is that of good faith bargaining. An employer violates 29 U.S.C. § 158(a)(3) by locking out his employees rather than negotiating with them or their designated bargaining unit. *See:* 152 A.L.R. 144. On the other hand, the employer is not guilty of a violation of an unfair labor practice under § 158(a)(1) or

(3), *supra*, when, after a bargaining impasse has been reached, he temporarily shuts down his plant and lays off his employees for the sole purpose of bringing economic pressure to bear in support of his bargaining position. *American Shipbuilding Co. v. N.L.R.B., supra.* It logically follows, I believe, that an employee [such as Cooper], although acting in concert, violates 29 U.S. C.A. § 158(b)(3) when, absent any effort or attempt to first initiate contact or negotiations with his employer, he exerts, induces or encourages his fellow employees to pursue unfair labor practices against his employer by means of promoting unannounced walkouts, work stoppages or similar unfair practices. *See:* 48 Am.Jur.2d, Labor and Labor Relations, § 810 and cases cited.

29 U.S.C.A. § 158(a)(5) provides that it is an unfair labor practice for an employer to fail to bargain collectively with the representatives of his employees. 29 U.S.C.A. § 158(d) provides that to bargain collectively is the performance of *the mutual obligation* of the employer and the employees' representative *to meet in good faith* with respect to terms and conditions of employment.

Following the decision of the administrative law judge, Empire filed an exception thereto which 'challenged the decision on the ground that the letters mailed by Cooper constituted "... an appeal for fellow employees of the various corporations of Empire Gas to engage in intermittent work stoppages. Thus the letter was unprotected activity under the law .. ." [R., Vol. III, p. 90.] The Board's subsequent Decision and Order did not address or discuss the intermittent work stoppage issue. [R., Vol. III, pp. 92, 93.] Even though the work stoppage issue was clearly presented by Empire in its exceptions aforesaid, the Board, in its brief, declares that "accordingly, the sole issue before the Court is whether Cooper's sending of the letters constituted protected concerted activity." [Brief of Board, p. 8.] Then, in absolute contradiction to the above contention, the Board's brief thereafter admits that "Before the Board, the Company's only contention was that Cooper's letter was

stripped of the Act's protection by his reference to two strikes as a possible course of concerted activity." [Brief of Board, p. 10.] From this point in its brief, the Board proceeds in four subsequent pages to justify Cooper's call for the work stoppages and, in effect, to decide the very issue it elected not to reach in its Decision.

I would deny enforcement of the affirmative relief ordered by the Board in relation to Cooper's reinstatement with back pay and other benefits.